LASSER, P.J.T.C.
Taxpayers contest the 1988 and 1989 real property tax assessments on the ten-building headquarters complex of Beneficial Management Corporation on the east side of Route 206 in Peapack & Gladstone Borough.
These actions are direct appeals to the Tax Court pursuant to N.J.S.A. 54:3-21. A municipal-wide revaluation was adopted for 1988, and it was stipulated that the level of assessment to be applied for 1988 and 1989 is 100% of market value. Valuation only is in issue.
Taxpayers’ complaints seek reductions in the 1988 and 1989 assessments, and taxing district’s counterclaims seek increases in the 1988 assessments.
In issue are the assessments on Block 20, Lot 10, a 71.272-acre parcel, a portion of which is the site of the headquarters buildings, and Block 33, Lot 13, the 9.345-acre parcel on the *362 west side of Route 206 upon which has been constructed the highway interchange and underpass providing the headquarters complex with access to Route 206.
The assessments in issue are:
[[Image here]]
Of the 71.272 acres in Lot 10, 60.272 acres are zoned office research/light industry, and 11 acres are zoned R-4 residential and are undeveloped. The Lot 13, 9.345-acre parcel is vacant land improved only with the interchange and underpass.
The subject property, the worldwide headquarters of Beneficial, is a single-user corporate headquarters complex of Italian Palladian architecture. It is a unique village-style grouping of brick two- and three-story office buildings on a beautifully landscaped campus-type rolling hillside site. The complex also includes two multi-level garage structures, a co-generation energy building, an employee gasoline service station, two tennis courts, a guard house, a clock/water tower, underground garages and brick-lined underground corridors (with light wells) connecting the buildings. The buildings are used principally as office space for the financial services and insurance business of Beneficial. The improvements include an executive office building, cafeteria, company store, barber shop, bank, workout room and medical facilities, all for the comfort and convenience of the approximately 1,100 employees.
Construction of the complex commenced in 1979, and it was ready for occupancy in 1981. The project included the construction of an interchange on Route 206, with an underpass providing ingress and egress to Route 206 in north and south directions. An interior ring road circles the complex.
*363 The headquarters complex comprises over one million square feet of buildings. See attached schedule 1 for detailed area breakdown.
There are a number of unusual architectural features, the Italian Palladian style, the extensive use of brick (2y2 million bricks), the arched shape of many of the windows, the approximately 50 false chimney structures, the octagonal shape of the executive office building, the 88-foot-high clock tower (campanile) which conceals the water tower, the light wells for the underground corridors, covered brick archways and arcades, brick patios, fountains, copper roofs and dormers, cobblestone piazzas, balconies, ornamental gates, 5,000 linear feet of telelift track for an electronic mail system throughout the complex, classic columns, television studio, fire protection and life safety and security systems with a security monitoring room.
Of the total 80.617 acres (Lots 10 and 13), approximately 30 acres are utilized by the headquarters complex. Limestone caverns under the 30 acres required 1,800-2,000 piles to support the subject buildings. The balance of the land is undeveloped.
The cost of the Route 206 interchange and underpass, referred to as “the trumpet,” has been included in the land value by taxpayers’ and taxing district’s appraisal experts. Its cost included the relocating and widening of Route 206, removal of the Brady Drive overpass and construction of the access roads. The direct cost of construction of the trumpet by Turner Construction Company (Turner), the general contractor, was $6,464,630. This is exclusive of the cost and/or value of the 9.345 acres on the west side of Route 206 used solely for the trumpet. An additional improvement cost contended by taxpayers to be included in the land value is for pilings, alleged by taxpayers to cost $4,500,000 but which Turner listed as piles and predrilling at $1,584,147.
The land is owned by Beneficial Facilities Corporation, having been acquired by Beneficial interests in 1978. The headquarters complex was constructed on this land by Beneficial Management Headquarters, Inc. Hamilton Associates, a limit-
*364 ed partnership in which subsidiaries of Paine Webber, Incorporated and Merrill Lynch & Co., Inc. were the general partners, was formed for the purpose of acquiring the headquarters complex from Beneficial Management Headquarters, Inc., leasing from Beneficial Facilities Corporation the 30 acres of land upon which it is constructed, and then leasing the complex and subleasing the land to Beneficial Management Corporation. The lease to Beneficial Management Corporation was for an initial term of 28 years beginning July 1, 1982, with lease renewal options which could extend the term for a total of 75 years from July 1,1982. The improvements were purchased by Hamilton Associates from Beneficial Management Headquarters, Inc. in June 1982 for $134,400,000, and, in addition, the partnership paid acquisition fees to the general partners totaling $8,870,400, for a total cost to the partnership of $143,-270,400 for improvements. A mortgage loan of $133,056,000 on the leased premises was made by California State Teachers Retirement System, secured by the improvements and the 30 acres of leased land.
I.

Taxpayers’ First Appraisal Expert.

Taxpayers presented an appraisal expert, Rinaldi, who valued the improvements by estimating their reproduction cost by the segregated cost method. This expert did not value the land.
Relying on two construction cost estimating services (Marshall Valuation Service and R.S. Means Company, Inc.) this expert applied unit construction cost figures from these cost-estimating services to the subject improvements and then adjusted these figures to October 1, 1987 and October 1, 1988. These costs were calculated for each construction item from excavation and site preparation through the roof structure for the ten buildings, and the underground corridors, the two parking decks, the co-generation building and the yard improvements. For depreciation purposes, this expert was of the opinion that, as of October 1, 1987, the complex had an effective age of four *365 years and, as of October 1,1988, an effective age of five years, and he posited a useful life of 60 years for structural components and 30 years for nonstructural components.
A summary of this expert’s cost estimates follows:
October 1, 1987 October 1, 1988
Total cost of buildings and yard improvements before depreciation and obsolescence $ 94,316,000[1] $101,201,000*
Building reproduction cost $ 83,610,000[2] $ 89,713,000*
Less physical depreciation (1987 average 9.9%) (1988 average 11.6%) -8,296,000** -10,361,000**
Less functional obsolescence due to excess construction of fiberglass ceiling panels - 530,000 - 570,000
$ 74,784,000 $ 78,782,000
Yard improvements 7,637,000[3] (replacement cost less physical depreciation) 7,641,000
Less 5% economic obsolescence —4,121,000 -4,378,000
Less excess operating expense obsolescence — 973,000 - 973,000
Net value $ 77,327,000 $ 81,072,000
Rounded $ 77,300,000 $ 81,100,000
* 7.3% increase over October 1, 1987
** The physical depreciation for each year is the combined structural and non-structural depreciation calculated as set forth in exhibit P-29 and adjusted to reflect an effective age of four years as of October 1, 1987 and an effective age of five years as of October 1, 1988.
This expert used some unit costs from the “excellent” category, some from the “good” category and a few from the “aver *366 age” category. When these costs were adjusted using only the excellent category, his cost figure increased from $94,316,000 to $111,988,628 for October 1, 1987.
On cross-examination, it appeared that this expert’s use of unit costs did not adequately account for the cost of non-standard items such as chandeliers, balustrades, octagonal-shaped building, clock tower, wrought iron fencing and gates, brick arches and arched windows, special raised plaster ceilings, herringbone-design wood flooring, special wood handrails, slate stairwells and additional width stairways. It also appeared that this expert’s costs did not include the road to the Fedders building, landscaping, environmental site planning, interchange and underpass roads, underground utilities, drainage and retention ponds and some soft costs.
Scribner, an associate of Rinaldi, testified for taxpayer that Beneficial’s actual cost of construction of the improvements was $111,348,166 and that the difference between this figure and the $134,400,000 sale price of the lease interest represented Beneficial’s gain on the sale. He testified that $24,470,084 should be deducted from $111,348,166 for excess costs due to site difficulties, fast track coordination problems and overtime.

Taxpayers’ Second Appraisal Expert.

Taxpayers presented a second appraisal expert, Welsh, who valued the property by the three approaches, cost, sales comparison and income. This expert used three methods in his cost approach: (1) the Marshall Valuation Service cost figures, (2) construction costs of other office buildings, and (3) trending up the actual Turner construction cost of the subject improvements. The cost approach using the Marshall Valuation Service was the replacement cost approach (not the reproduction cost approach used by the first expert), based on the Marshall *367 Valuation Service calculator cost method (as opposed to the segregated cost method used by taxpayer’s first expert).[4]
This expert valued 60.272 acres of land at $30 a square foot of building, for a total land value for this portion of Lot 10 of $17,500,000, which is the equivalent of $290,350 an acre for 60.272 acres.[5] The floor area ratio of square feet of building to the 60.272 acres of Lot 10 zoned for office use is approximately 22%. This expert stated that 20%-25% is a normal floor area ratio, although on the assessing dates there was no floor area ratio maximum in the taxing district’s zoning ordinance. Welsh concluded that, although the buildings were built on only 30 of the 60.272 acres of land and the Hamilton Associates transaction involved only these 30 acres, the balance of the acreage is not excess land. He stated that, based on customary floor area ratios, all 60.272 acres were necessary for the buildings as constructed. He valued the remaining 11 acres of residentiallyzoned land as 20 building lots at $75,000 each or a total of $1,500,000. He attributed no separate value to the 9.345 acres of Lot 13 or the improvements thereon on the ground that Lot 13 only gives value to Lot 10.
The result of his cost analysis by the first method cost approach is summarized as:
[[Image here]]
*368 [[Image here]]
Co-generation building $ 646,701[6]
Parking garage A 3,734,903
Parking garage B 5,211,934
Total direct costs $ 87,726,919
Plus indirect costs at 10% 8,772,692
$ 96,499,611
Less physical depreciation at 10% - 9,649,961
Cost new less physical depreciation $ 86,849,650
Plus site improvements Plus indirect costs at 10% $4,581,554 458,155
Total cost new Less 5% physical depreciation 5,039,709 - 251,985
Cost new less depreciation 4,787,724
Total cost of improvements less depreciation $ 91,637,374
Headquarters land value Residential land value 17,500,000 1,500,000
Total cost approach value as of October 1, 1987 $110,637,374
by the first method Rounded $110,500,000
*369 In his second method cost approach, this expert analyzed building costs of other office buildings, from which he concluded that a cost of $200 a square foot would be appropriate for the subject. For this method, he used a building area of 535,537 square feet instead of the total area of 1,017,507 square feet used for the first method, on the ground that it is the office and support areas, exclusive of building support areas, that are proper cost comparisons.[7] A breakdown of the building area appears on attached schedule 2. When applied to a building area of 535,537 square feet, this $200 figure yielded a cost new of $107,107,400. After deducting 9.75% for depreciation, this expert’s depreciated cost by this second method is $96,664,429, to which he added $17,500,000 for land for a total of $114,164,429, which he rounded to $115,000,000. Adding $1,500,000 for residential land results in a cost approach value by the second method of $116,500,000.
In his third method cost approach, this expert trended up the Turner construction cost of $109,694,521. He first deducted $12,592,341 for five items: (1) the cost of the Route 206 interchange and by-pass ($6,464,630), (2) a figure for pilings for foundations ($4,500,000) because items (1) and (2) were to be included in land value, (3) the food service equipment ($616,478), (4) draperies and blinds ($208,228) and (5) mail handling system ($803,005) because the expert believed that items (3), (4) and (5) were personal property. This resulted in an adjusted Turner construction cost of $97,102,180. He applied a cost increase index of 1.293648 to reflect the difference in cost from 1980 to October 1987, which resulted in a cost of $125,616,041, to which he added $646,701 for the co-generation building which was built later. He deducted 9.75% for depreciation, yielding $113,-952,125, and added the $19,000,000 land value, for a total value of $132,952,125.
*370 This expert’s final cost approach conclusion of the value of the subject on October 1, 1987 is $116,500,000 (including residential land at $1,500,000).
This expert did not add for entrepreneurial profit, stating that this element was to be added only for buildings built on speculation, not those built for owner use.
This expert testified that for the 1989 year, as of October 1, 1988, using a direct and indirect improvements cost in his first method cost approach and a 12% depreciation rate results in a depreciated cost of improvements of $96,449,875 plus an increased land value of $19,200,000 produced a total of $115,649,-875, which he rounded to $116,000,000. Adding $1,600,000 for residential land results in a total of $117,600,000. His comparable building cost (second method)[8] yielded $118,167,237, which he rounded to $120,000,000, and adding $1,600,000 for residential land results in a total of $121,600,000. He applied a time adjustment factor (1.388183) to his 1980 adjusted Turner construction cost of $97,102,180 (third method), then added the $695,907 cost of the co-generation building to the result, for a total of $135,491,503. He also applied a 12% depreciation factor, added the land value, and arrived at a total of $138,432,-523, which he rounded to $138,000,000. Adding $1,600,000 for residential land results in a total of $139,600,000.
This expert’s final cost approach conclusion of the value of the subject on October 1, 1988 is $121,600,000 (including residential land).
In his sales comparison approach estimate, this expert relied primarily on sales of three office buildings, two in Parsippany and one in Bedminster. Also considered were four sales of Morris and Somerset County office buildings and two sales of out-of-state corporate headquarters, one in Danbury, Connecticut (Union Carbide) and one in Greenwich, Connecticut (American Can). From these sales, this expert concluded that the subject would sell for $250 a square foot on October 1,1987 and *371 $260 a square foot on October 1, 1988. He multiplied these figures by 535,537 square feet, which resulted in a value of $133,884,250 ($134,000,000 rounded) as of October 1, 1987, to which he added $1,500,000 for residential land, and a value of $139,239,620 ($139,000,000 rounded) as of October 1, 1988, to which he added $1,600,000 for residential land. This expert did not consider the sale and leaseback of the property in 1982 an arm’s length transaction.
In his income approach estimate, this expert considered ten leases for space in good quality multi-tenant properties as well as asking rentals in the Exxon Research building in Clinton and the former Union Carbide and American Can buildings in Connecticut. Based on these rentals, this expert concluded that office space had a rental value of $25 a square foot net for above and below grade office space (394,420 square feet), $18 a square foot net for the computer space and below grade employee support space (53,149 square feet) and $9 a square foot for below grade service and operational support space (87,968 square feet). He attributed no rent to the mechanical/fan building support area (46,249 square feet), the lower level parking areas (174,908 square feet), the parking garages (247,-011 square feet) or the co-generation building (13,802 square feet). These square foot rental figures average $21.68 a square foot for 535,537 square feet, or $11.41 a square foot for the total 1,017,507 square foot area of the buildings.
This expert’s income approach calculation is:
[[Image here]]
*372 [[Image here]]
In estimating the October 1, 1988 value, this expert increased the rental values by 3.5%, resulting in a net rental of $10,845,-900 which was then capitalized at 8% for a value of $135,573,-750, which he rounded to $135,000,000, to which must be added $1,600,000 for residential land.
Following is a summary conclusions, including the of taxpayers' second expert's value value of the residential land:
[[Image here]]

The Stone & Webster Reports.

Stone & Webster prepared reports dated April 20, 1981 and March 23, 1982 for Blythe Eastman Paine Webber, Inc. and Merrill Lynch Leasing, Inc. in connection with the syndication *373 of the Beneficial lease for the Hamilton Associates Partnership. In anticipation of taxing district’s reliance on the March 23, 1982 Stone & Webster report, taxpayers presented as a witness, Fox, who testified that, while he was an employee of Stone & Webster, he participated in the preparation of a depreciable lifing study recommending the assignment of remaining economic lives for components of the Beneficial headquarters’ estimated costs (April 20, 1981 report). He also participated in the preparation of a report which assigned accelerated cost recovery system lives to improvements components (March 23, 1982 report). The construction costs used in the 1982 report are the same costs that were used in the 1981 report, and they apparently were based on an examination of construction cost documents in existence prior to April 20, 1981, which examination was prior to the completion of construction. The construction cost used in both reports was $152,485,412.[9]
The construction cost figures in the reports are only summary figures, without explanation as to source or which costs are actual and which are estimated. The substantial disparity between the Stone & Webster $152,485,412 cost figure and the Turner construction cost of $109,694,521 is unexplained by the reports or the testimony at trial. I have no reliable proof that the Stone & Webster cost figures are the actual cost figures nor any explanation of why basic construction costs such as concrete, masonry, structural steel, roofing and windows are so much higher on the Stone & Webster schedule than on the Turner schedule. For example, Turner’s cost for concrete is $13,167,696, and Stone & Webster lists $20,398,349. Turner’s cost for masonry is $9,196,164. Stone & Webster lists $14,474,-125. Without testimony explaining these differences, I cannot accept the Stone & Webster study as the actual cost of the Beneficial headquarters improvements.
*374 II.

Taxing District’s Appraisal Expert.

The appraisal expert for the taxing district testified that he used only the cost approach and did not use the income approach because the subject corporate headquarters is not income producing, and did not use the sales comparison approach because there are no comparable rental properties that equal the subject in quality and design.
Based on six land sales, he began with a figure of $250,000 an acre for land and increased that figure by 40% to $350,000 an acre for the 30 acres occupied by the buildings. This increase represented 20% for sewer availability and 20% for the trumpet interchange. For the 41.272 acres not occupied by the buildings, he increased the $250,000 an acre figure by 20% to $300,000 to reflect the influence of the trumpet interchange. He stated that $2,000,000, or $50,000 an acre, was paid by Beneficial for sewer availability. For Lot 13 he deducted 20% from his $250,000 an acre value. Therefore, his total value for land is:
[[Image here]]
This expert’s improvements value was derived from estimated construction costs shown in the March 23, 1982 report of Stone & Webster. From the Stone & Webster costs of $152,-485,412, he deducted $13,555,952 for the Route 206 interchange, lockers, fire extinguishers, graphics and food service equipment, including $3,000,000 for construction costs attributable to thé Komline (Fedders) building. He used the resulting cost of *375 $138,929,460 as the basis for his value of the subject improvements. Factors of 1.4476 and 1.3269 were used by this expert to bring the 1981 and 1982 cost figures in the Stone & Webster report to October 1, 1987. Applying these factors, he derived a value for the headquarters complex improvements of $194,843,-885, which he reduced to $175,359,496 by deducting 10% for depreciation. A nominal value of $1,000,000 was estimated for the improvements on Lot 13.
[[Image here]]
This expert did not separately value the property as of October 1, 1988.
As previously noted, this expert’s reliance on construction cost estimates that were made to assign a cost basis to the limited partnership for depreciation purposes can be given little weight because of the questionable reliability of the lifing study for valuation purposes, the lack of verification of the figures used and because the Stone & Webster figures varied substantially from the Turner construction cost, without explanation for the variation.
III.
I find that the subject property is a “one of a kind” corporate headquarters of unique design. Little expense was *376 spared in creating buildings that constitute a corporate signature and provide a most pleasing and unusual atmosphere for those who use them. Even the best quality investment-type office buildings or most corporate headquarter buildings (with the possible exception of AT & T corporate headquarters in Basking Ridge, which was not used as a comparable in this case) are not comparable with the subject buildings. Due to its unique design and the use of costly materials and specialized labor, this property cannot be valued by the income approach because the rent to be attributed to this owner-occupied building is purely speculative. The property cannot be valued by the sales comparison approach because it is quite different from office buildings that have sold in the market. The sale of the property in 1982 is not a reliable basis for valuation because it is a sale-leaseback transaction and a syndication of the limited partnership interests, which is essentially a financing transaction. The limited partners purchased a stream of income. The purchase price paid was related to the annual rental and the income tax benefits, not necessarily to the market value of the property.

Land Value.

Taxpayers’ expert, Welsh, and taxing district’s expert each used several land sales to derive their estimate of the land value. Many of the same sales were used by both experts, but in some cases the interpretation of the sale resulted in a different price per acre. In addition to analyzing the price per acre, taxpayers’ appraisal expert also analyzed the land sales based on price per square foot of building constructed or to be constructed on the land.
Following is a summary of the land sales of the two experts:
[[Image here]]
*377 [[Image here]]
The Edison sale is of a high-rise building and is therefore not comparable. The remaining eight sales range in price from $134,000 to $313,300 an acre and $19.50 to $42.45 a square foot of building. Taxpayers’ expert selected a land value of $30 a square foot of permitted building, which he applied to 581,786 square feet for a value of $17,500,000 (rounded). This amounts to $245,538 an acre for 71.272 acres, or $217,076 an acre for 80.617 acres including the Lot 13 acres. This expert added $1,500,000 for the residentially-zoned land for a total value of $19,000,000 as of October 1, 1987.
[[Image here]]
Sale no. 9 is zoned residential. The remaining eight sales range in price from $143,800 to $337,800 an acre. Taxing district’s *378 expert selected $250,000 an acre, but he increased this amount by 40% for the 30 acres improved with office buildings, increased it by 20% for the 41.272 unimproved acres, and decreased it by 20% for the Lot 13 acreage, for a total land value of $24,750,600, or $347,270 an acre for 71.272 acres, or $307,015 an acre for 80.617 acres including the Lot 13 acreage.
I find that the value of Lots 10 and 13 (a total of 80.617 acres) is $250,000 an acre or a total of $20,154,250 as of October 1, 1987. I include in this total the value added to the property by the interchange and underpass at Route 206 and the correction of subsurface conditions by piling.
It was taxpayers’ second expert’s opinion that the land value increased by 10% from October 1, 1987 to October 1, 1988. J accept this percentage and apply it to my October 1, 1987 land value, for an October 1, 1988 land value of $22,169,675.

Value of Improvements.

As to the improvements, there are three cost approach indicators of value in evidence: (1) reproduction or replacement cost based on construction cost figures from construction reporting services such as Marshall Valuation Service or R.S. Means Company, Inc., (2) actual cost of other office buildings, and (3) the actual cost of construction trended up to October 1, 1987 and October 1, 1988. The construction costs made available by the reporting services are intended for an average building, but can be highly inaccurate when applied to a custom building of unusual design such as the subject. A brick wall may be accurately priced, but when it contains arches and unusually-shaped windows the labor cost is difficult to predict from reported costs of average buildings. Similarly, the actual cost of other office buildings of less elaborate construction are of questionable utility. The actual construction cost of a relatively new building of unique design is bound to be more accurate.
I find that the most reliable indicator of the value of this unique property is the actual cost of construction trended up to the applicable assessment dates. I therefore begin with *379 the Turner construction cost of $109,694,521. The Turner contract is a maximum price contract. The cost can be regarded as reasonable due to the restraints of such a contract. Taxpayers seek to deduct from this cost for site difficulties, fast-track coordination problems and overtime. Some delay and overtime on a project of this magnitude and uniqueness are customary and must be accepted as part of the cost. Taxpayers contend that $4,500,000 must be deducted for piling. I will deduct the Turner construction cost of $1,584,147 for piling and predrilling because I have included this cost in the land value. I am not convinced by the proof that the deduction of any greater amount is justified. I do not deduct for the food service equipment and mail handling system because I am satisfied that these are part of the real property within the statutory definition. See L. 1986, c. 117, N.J.S.A. 54:4-1. I do deduct $6,464,630, the cost of the interchange and underpass, and $208,228 for draperies and blinds. The Turner construction cost did not include the following indirect costs:
Environmental site planning
Interior design
Architect
Landscape architect
Cost of bringing utilities to the site
Project supervisor
Civil engineer
Mechanical engineer
Structural engineer
Traffic consultant
Financing charges
Interest during construction
Taxes during construction
Insurance
Legal fees
I add a conservative 12% of the Turner construction cost, net of the 206 interchange and piling cost, for soft costs.[10] A higher *380 soft cost figure might be justified because the architects’ fees alone amounted to 8%, and the cost of the many planners, designers, engineers, consultants and insurance, and the financing charges, taxes and interest and legal fees were substantial. However, the actual interest cost, which was a major item, was unusual because of high interest rates occurring at that time, and I have therefore stabilized my soft cost figure.
My resulting cost for improvements before adding for the cogeneration building and equipment and entrepreneurial profit is $113,610,018. This figure is comparable to the cost figures shown on taxpayers’ exhibit P-57, taking into consideration the fact that the figures shown on P-57 do not appear to include all soft costs.[11] For example, in connection with an Internal Revenue Service audit of the sale-leaseback transaction, Beneficial contended that its cost was equal to the sale price of $134,400,-000, but the Internal Revenue Service deducted capitalized costs not associated with the cost/basis of the improvements sold, thereby reducing the cost of improvements sold to $113,-002,670, and concluded that the gain to Beneficial on the transaction was $21,397,330. The audit calculations dealt with capitalized costs and therefore did not include soft costs ex-pensed by taxpayers.
*381 I add a conservative 10% of the direct and soft costs for entrepreneurial profit. Entrepreneurial profit is justified,[12] even for an owner-constructed and owner-occupied building because the principle of uniformity requires such property to be treated in the same manner as investment or speculation type property. See McGinley Mills v. Town of Phillipsburg, 9 N.J.Tax 508, 517 (Tax Ct.1988) (“[I]t is necessary to include a figure which reflects the time, effort and incidental expense of the owner in the development of the property”); Lawrence Associates v. Lawrence Tp., 5 N.J.Tax 481, 535 (Tax Ct.1983) (realistic cost approach must recognize adequate compensation to the entrepreneur to induce him to organize the project); American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) at 360 (“Entrepreneurial profit is a necessary element of cost because it motivates developers to construct improvements.”) Although the subject property may not have been built for sale, it actually was sold, and there was a substantial profit to Beneficial.
I find the cost conversion factors for Somerset County shown in the Real Property Appraisal Manual for New Jersey Assessors to be more appropriate than those of the Marshall Valuation Service for the Eastern District of the United States. Rinaldi testified that the complex was ready for occupancy in 1981. I find that in trending up the actual construction costs, the cost conversion factors for Somerset County from the Real Property Appraisal Manual for New Jersey Assessors for October 1981, October 1987 and October 1988 should be used.[13] Use of the year of substantial completion as the base year is *382 consistent with customary assessing practice and therefore promotes uniformity of assessment.
I have deducted 10% for depreciation in 1987 and 12% in 1988, which percentages are not in issue. The property is relatively new (four- and five-year effective ages) and very well maintained. It is fully used as an owner-occupied corporate headquarters property. Therefore, there is no justification for a deduction for functional or economic obsolescence. See CPC International v. Englewood Cliffs, 193 N.J.Super. 261, 473 A.2d 548 (App.Div.1984), certif. den. 97 N.J. 578, 483 A.2d 124 (1984). I regard the cleaning or painting of the fiberglass panels to be normal maintenance and repair.
I find that the boilers, turbines and related equipment in the special purpose co-generation building are real property. See Texas Eastern Transmission Corp. v. Taxation Div. Director, 11 N.J.Tax 198 (Tax Ct.1990). I therefore add for the co-generation building and equipment constructed later, using $1,085,000 for the building and $7,763,000 for the equipment, which figures are derived from the Rinaldi appraisal, and then deduct for depreciation.[14]
My calculations are as follows:
[[Image here]]
*383 [[Image here]]
I conclude that the proper assessments for the subject properties are:
[[Image here]]
The Clerk of the Tax Court is directed to enter a judgment in accordance with this opinion.
*384 SCHEDULE 1
Summary of square foot area breakdown of Beneficial headquarters (in square feet)
[[Image here]]
* Rinaldi report uses 252,523 square feet
** Rinaldi report uses 15,077 square feet
*** Rinaldi report shows 1,024,293 square feet
Breakdown of gross building area of buildings 1 through 10 (in square feet)
Office space
[[Image here]]
*385 SCHEDULE 2
Breakdown of 535,537 square foot building figure used by taxpayers’ second appraisal expert
[[Image here]]
Areas excluded
[[Image here]]

 $83,610,000 (exhibit P-29) + $10,866,000 (yard improvements cost) minus $160,000 (tennis courts) = $94,316,000.

 $82,039,427 + $275,773 (sprinkler) + $1,214,872 (floor covering) + $80,000 (elevator) = $83,610,000 (rounded).

 $10,866,000 minus $160,000 = $10,706,000 minus $3,069,000 depreciation = $7,637,000.

 The calculator cost method does not cost each component separately but applies a square foot cost which includes all components within that area. There were substantial differences between the segregated cost method and the calculator cost method. For instance, the cost of the clock tower was $248,000 by the former method and $356,000 by the latter.

 581,786 sq. ft. x $30/sq. ft. = $17,453,580 ($17,500,000 rounded) 4- 60.272 acres = $290,350/acre.

 The second appraisal expert did not include the boilers, turbines and other equipment in the co-generation building as real property. This property had been included by the first expert at $7,763,000. The first appraisal expert estimated the cost of the co-generation building at $1,085,118. In addition to the electrical generating and heating equipment in the co-generation building, there is a complete heating unit in building no. 5 to service all buildings.

This expert used 535,537 square feet for methods two and three of the cost approach and the income and sales comparison approaches to value improvements and 581,786 square feet to value land.

 Using $210 a square foot and 12% depreciation.

 This figure includes the cost of improvements to the Komline (Fedders) building, which is not a part of the Beneficial headquarters.

 Actual soft costs in evidence are:
Architects’ fees $ 8,181,254
Engineering fees 1,144,268 *380 Consultants’ fees $ 2,713,768
Legal fees 592,792
Permits 111,567
Bonds & insurance 311,154
$13,054,803
In addition, interest during construction amounted to $21,433,556. Other financing charges and taxes paid during construction are not in evidence.

 Taxpayers’ exhibit P-57 compares construction costs as follows:
Adjusted Beneficial costs $112,376,417
Internal Revenue Service computed costs $113,002,670
Miller-Rinaldi computed costs $111,348,166
Average computed cost $112,242,418

 See Acolia, “The Enigmatic Entrepreneurial Profit Factor,” Property Tax Journal (March 1984) and Kiske, "The Use and Misuse of Entrepreneurial Profit,” 1 Journal of Property Taxation 109 (1989). Although both articles discuss modified uses of entrepreneurial profit in the valuation process, they do recognize the need to reflect this factor.

 The factor to trend October 1981 cost (1.56) to October 1987 (2.05) is 1.3141. The factor to trend October 1981 cost (1.56) to October 1988 (2.16) is 1.3846.

 Rinaldi's co-generation building costs as of October 1, 1987 were $1,085,118 for the building and $7,763,000 for the equipment, before depreciation. Of these costs, $813,352 were structural costs and the balance non-structural. Rinaldi used 6.7% depreciation for structural items and 13.3% for non-structural items. Applying these depreciation rates yields $986,905 for the building and $6,730,521 for equipment or a total of $7,717,426 as of October 1, 1987. Increasing this figure by 7.3% results in $8,280,798 as of October 1, 1988.
Rinaldi's co-generation building and equipment cost figures reflect some, but apparently not all, soft costs, but I accept Rinaldi's figures since I do not have specific evidence of the omitted soft costs.