SMALL, P.J.T.C.
The above-captioned appeals of the tax assessments of a catering hall in Garwood, New Jersey raise three major questions of *242 fact and law: (1) Should the matters have been dismissed at the end of plaintiffs case? (2) In using the cost approach to value, should entrepreneurial profit have been added to the cost of construction using the Marshall and Swift method of calculating the value of improvements? and (3) Because the inadequate parking on the property constitutes functional obsolescence, if the property’s highest and best use is as a catering hall how is that functional obsolescence to be calculated? Additional and less important issues regarding the comparability of sales of land and proper adjustments to those sales and the proper calculation of the cost of construction of the improvements are also presented for determination.
At the end of plaintiffs case, defendant moved for judgment. I denied that motion, but defendant has asked me, under R. 4:49-2, to reconsider my determination on that motion prior to ruling on the other issues. I have concluded that it was appropriate to deny defendant’s motion at the end of plaintiffs case and accordingly, deny the motion to reconsider that determination. Although plaintiff has made no better case than it did at the end of its case, the standards by which its evidence must be judged at the end of its case and at the end of both parties’ eases are different. Passarella v. Township of Wall, 22 N.J.Tax 600, 603 (App.Div. 2004). On defendant’s motion at the end of plaintiffs ease, all inferences must be drawn in plaintiffs favor. After both parties have put in their case and rested, the plaintiff is no longer entitled to those favorable inferences. Defendant’s burden of persuasion at that stage of the litigation is easier. Accordingly, after having heard all of the evidence, reexamining my denial of defendant’s motion at the end of plaintiffs case would serve no practical purpose other than perhaps limiting the evidence to be considered were an appeal taken from my determination after hearing all of the evidence. I am persuaded by the defendant’s case on the merits, as a matter of law and fact; I find it appropriate to decide the matter by analyzing all of the evidence rather than simply dismissing plaintiffs case for a failure of proof.
I also have concluded that entrepreneurial profit should be added to the cost of construction. And, I have concluded that *243 although there is functional obsolescence because of the lack of adequate parking adjacent to the subject property, plaintiff’s method of calculating that obsolescence is not supported by appraisal literature and is inherently illogical. Accordingly, I have calculated appropriate values of the subject property on the assessing dates and determined that for both years the ratios of the assessments to the fair market value fall within the common level of the Chapter 123 corridor and that therefore the assessments made by the municipal assessor must be affirmed.
The subject property is a 31,843 square foot catering facility with a basement of 6,026 square feet and a separate warehouse of 1,176 square feet. It sits on 60,000 square feet of land. It is adjacent to another 60,000 square foot property, which is leased by the owner of the subject property for parking in order to accommodate the needs of the subject property for adequate parking in running its catering business.
For both years 2006 and 2007, the subject property comprising several lots and blocks in Garwood was assessed as follows:
Land $ 463,300
Improvements 1,484,400
$1,947,700
The Chapter 123 ratios (L. 1973, c. 123, N.J.S.A. 54:51A-6) for each year are as follows: for 2006-34.17% with a lower limit of 29.04% and an upper limit of 39.30%; and for 2007-30.77% with a lower limit of 26.15% and an upper limit of 35.39%. Plaintiff’s expert valued the subject property at $3,089,141 for 2006 and $3,672,060 for 2007. Defendant’s expert valued the subject property at $6,020,879 for 2006 and $6,293,530 for 2007. Each expert relied principally on the cost approach to value. Plaintiff’s expert did a comparable sales analysis but ultimately concluded that it was of no use. Similarly, defendant’s expert used a comparable sales analysis and concluded that it was only useful in confirming his conclusions based on the cost method.
The comparable sales analysis was deemed unreliable because the experts’ comparable sales involved the sale of real estate as *244 well as furniture, fixtures and equipment and the associated business. The value assigned to the real estate was an allocation made by the buyer and seller and not something determined separately in the market. An allocation such as this is unreliable for setting a market price of the real estate alone. See Worden-Hoidal Funeral Homes, Inc. v. Borough of Red Bank, 21 N.J.Tax 336, 344-45 (Tax 2004) (noting that because “many of the comparable sales testified to by both [the] plaintiffs and [the] defendant’s experts [were] based on agreements by the parties to the transactions as to the allocation of the sales prices between the real estate and the [funeral home] business[,] ... [t]he sales price allocated to the real estate [might] not, therefore, reflect market value with any degree of precision”).
I.

Comparison of Experts’ Calculations

The two experts’ opinions of value using the cost method were calculated as follows:
_Tax Year 2006_
Plaintiff s Expert Defendant’s Expert
Land Value $1,500,000 $2,160,000 ($25.00/sq.ft.) ($36.00/sq.ft.)
Replacement Cost New of Improvements $4,627,344 $5,161,603
Entrepreneurial Profit — 516,160
Cost New ol' Improvements $4,627,344 $5,677,763
Less: Physical Depreciation (1,203,109) (26%) (1,532,996) (27%)
Functional (185,094) (4%) (283,888) (5%) Obsolescence (includes inadequate parking)
Economic Obsolescence
*245 (inadequate parking) (1,650,000) —
Total (Land and Improvements) $3,089,111 $6,020,879
Tax Year 2007
Plaintiffs Expert Defendant’s Expert
Land Value $1,890,000 $2,250,000 ($26.50/sq.ft.) ($37.50/sq.I't.)
Replacement Cost New of Improvements $5,044,371 $5,569,601
Entrepreneurial Profit — 556,960
Cost New of Improvements $5,044,371 $6,126,561
Less: Physical Depreciation (1,311,536) (26%) (1,776,703) (29%)
Functional (201,775) (4%) (306,328) (5%) Obsolescence (includes inadequate parking)
Economic
Obsolescence (inadequate parking) (1,749,000) —
Total (Land and Improvements) $3,672,060 $6,293,530
I will discuss each element of value.
II.

Land Value

Each expert selected comparable vacant land sales, and adjusted them to the subject to conclude a per square foot value of land. Plaintiffs expert used two land sales in Garwood and one in Mountainside. Through cross-examination, defendant’s attorney *246 demonstrated that land sale # 1 was for eventual development as a shopping center. Plaintiffs land sale # 2 was for eventual use as residential and retail. Plaintiffs land sale # 3 was for eventual use as a restaurant. All three uses were different than the conclusion of plaintiffs expert that the highest and best use of the subject was a catering hall. On that basis alone, defendant’s . attorney argued that plaintiffs evidence was inadequate to rebut the presumption of correctness that attaches to the assessment. See Pantasote Co. v. City of Passaic, 6 N.J.Tax 34, 39 (Tax 1983), aff'd, 7 N.J.Tax 663, 664 (App.Div.1984), aff'd, 100 N.J. 408, 412-13, 495 A.2d 1308 (1985) (citing Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952)) (see discussion at page 2 of this slip opinion). I find, after examining all of the evidence, that although plaintiff produced evidence that was probably insufficient to overcome the presumed correctness attached to the original assessment and thus showed no right to relief; and under R. 4:37-2, it might have been appropriate to have dismissed the case. I nevertheless will examine all of the evidence. I am mindful that our Supreme Court has instructed this court not to place too heavy a burden of proof on taxpayers and that the standards of proof are different at the end of plaintiffs case than at the conclusion of the trial. See Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 284, 491 A.2d 1247 (1985); see also Passarella, supra, 22 N.J.Tax at 603.
Defendant’s expert used comparable land sales. Two were for restaurant use, one of which (defendant’s land sale # 3) had also been used by plaintiffs expert (plaintiffs land sale # 3). The other three were used as branch banks. Thus, neither expert found a single comparable land sale of the seven different land sales selected that was purchased for use as a catering hall. Again mindful of our Supreme Court’s admonition in Glen Wall, supra, 99 N.J. at 284, 491 A.2d 1247, and in Ford Motor Co. v. Township of Edison, 127 N.J. 290, 314-15, 604 A.2d 580 (1992), I choose to analyze the two experts land sales as follows.
Plaintiffs expert’s time and other gross adjustments ranged between 46% and 51%. Defendant’s expert’s gross adjustments ranged between 20% and 45%. On the one property they selected *247 in common, the gross adjustments of plaintiffs expert were 51% with a net adjustment of negative 19%. The gross adjustments of defendant’s expert were 45% with a net positive adjustment of 25%. The difference in these percentages was mainly due to the experts’ location adjustments. Defendant’s expert found the subject location 10% superior to the Mountainside location and plaintiffs expert found it 25% inferior to the Mountainside location. Although the subject location might have been inferior to land sale # 3 as a restaurant, I am persuaded that the subject’s location as a catering hall was superior to the Mountainside location because of its proximity to Westfield and Cranford and the fact that a catering hall (unlike a restaurant) need not be on a high traffic highway with great visibility. Had plaintiffs expert concluded that the highest and best use of the subject were as a restaurant, I might have been persuaded by his adjustments; however, having concluded that the highest and best use was as a catering hall, which was essential to his single highest reduction in value, see Part VII infra (discussing obsolescence due to inadequate parking), his adjustment of negative 25% from his land sale # 3 is unsupported. Accordingly, I find defendant’s expert’s conclusion of land value more persuasive than that of plaintiffs expert.
III.

Cost New

The two experts concluded the value of the subject’s improvements new based on the use of the Marshall and Swift cost calculator. Plaintiffs expert fed information into a computer model. The defendant’s expert relied on a manual lookup from published tables. The defendant’s expert made much of the fact that in adding the component values together, plaintiffs expert failed to include the elevator. This was corrected at trial and I find it to be the result of no more than a careless review of the calculations by plaintiffs expert. Plaintiffs expert failed to include the actual computer printouts from Marshall and Swift or have them copied into his report. He ascribed this to the fact that Marshall and Swift was a PC computer system, his offices report *248 writing system is Apple based and the two systems are incompatible. This is a weak argument. He could have photocopied the Marshall and Swift printout just as he photocopied photographs that appear in his report. Defendant argued that if he was merely copying he would not have failed to include the elevator in his final calculation. Defendant also argued that the computer was a “black box” and that, having failed to include the computer’s printouts, plaintiff’s expert’s opinion of value was a net opinion or, at best, not based on a fully disclosed calculation tracing back to the Marshall and Swift formulas’ unit values.
Plaintiff argued that the undisclosed computerized system was more up to date than was the manual system of the defendant’s expert. In the end, the difference between the two experts’ conclusions of the value of the undepreciated improvements was no greater than 9%. Because the basis of the calculations of defendant’s expert was disclosed and because he made no apparent errors in calculations, I find his conclusion of undepreciated value to be more persuasive than that of plaintiffs expert. This is not to say that the manual system is more accurate or to be preferred to the computerized system. However, when using a computerized system, more must be included in the expert’s testimony and report than his inputs and the computer output; at a minimum, the expert should have included data as input to the Marshall and Swift Program and its output in the form of the original, or photocopies of the original Marshall and Swift input and output sheets. In this instance, the facts on which the defendant’s expert relied and the method by which he calculated cost new of the improvements stands on much more solid ground than does plaintiffs expert’s and I will adopt his calculations.
IV.

Entrepreneurial Pi vfit

Plaintiffs expert did not add entrepreneurial or developer’s profit to his construction costs, arguing that a custom-built building should not include such an expense. Defendant’s expert added 10% entrepreneurial profit because it was his opinion that entre *249 preneurial profit should be added in all instances where the cost method of valuation was used.
Entrepreneurial profit is “[a] market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; [equaling] the difference between the total cost of a property (cost of development) and its market value (property value after completion).... ” Appraisal Institute, Appraisal of Real Estate, 360 (12th ed.2001).[1] As the tables at the end of this Part demonstrate, New Jersey courts include entrepreneurial profit within the market value of property where the developer or owner-operator makes improvements to property with the anticipation of realizing a profit on its subsequent resale. See Lawrence Assocs. v. Township of Lawrence, 5 N.J.Tax 481, 535 (Tax 1983). Such entrepreneurial incentive[2] is ‘Taj market-derived figure that represents the amount an entrepreneur expects to receive for his or her contribution to a project and risk.” Appraisal of Real Estate, supra, at 360. Whether *250 called “entrepreneurial profit” or “entrepreneurial incentive,” it represents the difference between the total of (1) the cost of acquiring land plus (2) the cost of constructing an improvement and the improved property’s market value.
New Jersey courts do not consider the status of the builder (as developer or owner-operator) dispositive to the determination of whether to include entrepreneurial profit within market value. See Beneficial Facilities Corp. v. Borough of Peapack & Gladstone, 11 N.J.Tax 359, 381 (Tax 1990), aff'd, 13 N.J.Tax 112 (App.Div.), certif. denied, 130 N.J. 397, 614 A.2d 619 (1992) (including entrepreneurial profit within market value of an ownerconstracted and owner-occupied building “because the principle of uniformity requires such property to be treated in the same manner as investment or speculation type property”).
Additionally, although they generally do not recognize entrepreneurial profit where there is no market data supporting its inclusion within market value, see, e.g., Brae Assocs. c/o Hertz Realty v. Borough of Park Ridge, 19 N.J.Tax 306, 314 (App.Div.), certif. denied, 170 N.J. 87, 784 A.2d 719 (2001); B.F. Goodrich Co. v. Township of Oldmans, 17 N.J.Tax 114, 122-23 (Tax 1997), aff'd, 323 N.J.Super. 550, 733 A.2d 1204 (App.Div. 1999); Badische Corp., supra, 11 N.J.Tax at 402; Litton Business Systems, Inc. v. Borough of Morris Plains, 8 N.J.Tax 520, 533 (Tax 1986), aff'd, 9 N.J.Tax 651 (App.Div.1988); Berkley Arms Apartment Corp. v. City of Hackensack, 6 N.J.Tax 260, 272-73 (Tax 1983), New Jersey courts may still infer entrepreneurial incentive, and thus recognize and include entrepreneurial profit within a property’s value, if they find, despite the absence of supporting market-evidence, that such property would not be improved but for the likely compensation of a developer’s or owner-operator’s efforts. See Twin Oaks Assoc. & Health Res. v. Town of Morristown, 9 N.J.Tax 386, 397 (Tax 1987) (determining that “[although there [was] no acceptable market-derived evidence of the price that the subject property [would] sell for in the market, on an unencumbered basis, from which to determine the difference between the replacement cost and the market value, ... this nursing home *251 would not be built, with all of the permits and licenses required, unless the developer could be assured that his efforts would be compensated.”), aff'd, 11 N.J.Tax 94 (App.Div.), certif. denied, 117 N.J. 155, 564 A.2d 875 (1989).
Plaintiffs expert concluded that entrepreneurial profit should be excluded from the market value because the catering hall is uniquely designed, with special construction features and layouts that restrict its utility to the use for which it was built such that only specific users (i.e. other catering halls or buyers with uses similar to those of catering halls) will pay the full cost of improvements; this, plaintiffs expert asserts, causes immediate functional obsolescence. Plaintiffs expert next concluded that entrepreneurial profit should be excluded from the market value because catering halls are not constructed by developers in the expectation of profit on sale but rather are constructed by owner-operators for use in their businesses without any entrepreneurial incentive in mind. Defendant’s expert concludes that entrepreneurial profit should be included in the market value of the catering hall.
The first conclusion of plaintiffs expert—that the catering hall being custom-built for purposes of a specific type of owner-operator precludes entrepreneurial profit—directly contradicts the discussion in the Appraisal of Real Estate, which states, “the value of custom-built properties should also reflect an entrepreneurial profit.” Appraisal of Real Estate, supra, at 362 (comparing the treatment of custom-built properties to those built by developers on speculation). Even if such argument were attributed weight, plaintiffs expert incorrectly relies on functional obsolescence as support for excluding entrepreneurial profit from market value where New Jersey courts make such determinations independently. See American Cyanamid Co. v. Township of Wayne, 17 N.J.Tax 542, 560-61 (Tax 1998) (stating that “[biased upon the [Appraisal of Real Estate ], I conclude that a factor for entrepreneurial profit should initially be included in the cost approach analysis for the subject property, although the impact of such factor could be nullified by a later deduction for external obsolescence attributable to weak market conditions.”), aff'd, 19 N.J.Tax 46 (App.Div.2000).
*252 The second conclusion of plaintiffs expert—that catering halls are not constructed by developers in expectation of profit on resale—is contradicted by New Jersey ease law and the facts in issue, both of which indicate that there is sufficient market evidence to support the owner-operator’s entrepreneurial incentive, and thus inclusion of entrepreneurial profit within market value. In Sears Roebuck & Co. v. Township of Rockaway, 12 N.J.Tax 381, 390 (Tax 1992), this court considered the location of the subject property in a thriving regional mall, despite the absence of sales volume information, to be sufficient market evidence supporting a reasonable inference of expected profit and thus inclusion of entrepreneurial profit within market value. The court stated:
Further, the fact that this is an apparently successful department store in a well-located and successful regional mall, and the absence of sales volume information, give rise to an inference that the market would recognize a profit for the developer. This justifies the inclusion of entrepreneurial profit in the cost approach based on a reasonable estimate of the. profit entrepreneurs expect in the development of similar projects.

[Ibid.}

Here, the catering hall is located near an expanding district of mixed (commercial and non-commercial) use property. The catering hall is located on a commercial roadway, and the immediate surrounding area is comprised of commercial occupants such as: ShopRite Supermarket, Westfield Lumber, the Crafty Kitchen, Gold Medal Fitness, the Mattress Factory, Manufacturing Equipment Salesmen, Hess Gasoline Station, Independence Community Bank, Robert’s Steak House, Garwood Plaza and CVS Center, Garwood Lanes, Burger King and McDonald’s. .Also located in close proximity to the catering hall are: the Cranford Business district 05 mile east of subject property), country clubs, recreation centers, public transportation (train station), schools, and various condominiums and town homes. Defendant’s expert states that local construction and population trends have been increasing. Such market evidence positions the catering hall in a thriving location comparable to that of the subject property in Sears Roebuck. The catering hall’s location in an expanding district may, like the Sears Roebuck project, give rise to an inference of profit. It follows that plaintiffs substantial renovations to the *253 property in 2002 and 2003 (which increased the catering hall’s useful life by 20+ years), were made in part in anticipation of realizing a profit on resale of the hall at some point in the future.
Additionally, the conclusion of plaintiffs expert—that the catering hall being custom-built and attractive only for purchasers with similar anticipated uses precludes entrepreneurial profit—does not negate the owner-operator’s entrepreneurial incentive; it is reasonably foreseeable that the owner-operator in this ease would consider it likely that a buyer would purchase the hall and then renovate it into an alternate use, similar to plaintiffs third comparable sale, in which Petsmart purchased a banquet hall and renovated it to fit an alternate use. This scenario is especially plausible in expanding commercial districts, in which businesses buy and renovate properties to secure a competitive advantage.
Even without such specific market evidence, I find, consistent with the holding in Twin Oaks Assocs., supra, that entrepreneurial incentive should bo added where an owner-operator of a catering hall, with many required permits and licenses, would not substantially renovate and improve the property but for the assurance that he or it would be compensated therefor. Cf. Twin Oaks Assoc., supra, 9 N.J.Tax at 397.
For the reasons discussed above, 1 find that entrepreneurial profit should be included in calculating the catering hall’s market value because there is sufficient market evidence, as well as inferences that may be drawn therefrom, that demonstrate the owner-operator of the catering hall most likely purchased and made improvements to the property in light of his or her entrepreneurial incentive.
As no other conflicting evidence of the amount of entrepreneurial profit has been placed in the record, I accept the 10% of construction costs quantification of defendant’s expert.
The following tables summarize eases of the Tax Court of New Jersey which have included and excluded entrepreneurial profit when applying the cost method to valuation.
*254 [[Image here]]
*255 [[Image here]]
*256 [[Image here]]
*257 [[Image here]]
*258 [[Image here]]
*259 [[Image here]]
*260 entrepreneurial profit, the compensation to lite builder-developer for hi* time, energy and initiative. at 533. Id, adding entrepreneurial profit to the cost was not a valid nor reliable indicator of value. fi i Texas Pastern Transmission Com Tovvnshinof Hast Amwell. 13 N.J.Tax 24.25-26 (Tax 19921 (pipeline), qfPd. 18 NJ Tax l26(App Div. 1999). "The segments of interstate natural eas transmission omelme at issue ore. a kind of property for which entrepreneurial profit or loss analysis is numpropriatc There is simply no indication of any market against which to compare replacement cost. Pipeline is not constructed by developers in the expectation of profit on its sale." Id at 26-27 (emphasis supplied) Yes. The taxpayer's appraiser did nnt include entrepreneurial profit in die cost-based value estimate "while the appraiser for the taxing districts add(cd] an entrepreneurial profit factor of 10& of all replacement costs .." id at 40 ► Subject property was interstate natural gas transmission pipeline. * There is no indication of any market against which to compare replacement cost. Pipeline is not constructed b> developers in the expectation of profit on its sale. It is exclusively constructed by regulated operating companies for use in their business at costs which me passed through to the ratepayers. • The expen for the taxing districts produced no market data in this case, and his reliance on the taxpayer’s expectation of profit from the operation of the pipeline confuses business profit with development reward. Id, at 27.
Thus those cases which did not add entrepreneurial profit to cost method calculations are distinguishable from this case because of a lack of proof or the very unique nature (pipelines) of the property. None of those distinguishing factors is present is this case.
V.

Physical Depreciation

The experts’ total depreciation of the subject property is as follows: plaintiffs expert determined 26% for both years, and defendant’s expert determined 27% for 2006 and 29% for 2007. Because the depreciation of defendant’s expert appears to be more precise, and because his work is generally more accurate and verifiable than that of plaintiffs expert, I adopt his conclusion of effective age of 12 and 13 years over a 45 year useful life. I note that his physical depreciation conclusions were greater than plaintiffs expert’s conclusions for both years.
*261 VI.

Obxolexcence Other Than Parking

Plaintiff subtracted an additional 4% depreciation for functional obsolescence for layout and lack of a canopy or portecochere. Defendant subtracted an additional 5% because of the layout and inadequate parking. I adopt the 4% figure of plaintiffs expert for the physical detriments of the subject’s improvements and discuss the appropriate deduction to be taken for inadequate parking in Part VII infra.
VII.

Obxolencence Due to Inadequate Parking

There is no question, because both experts agree, that the subject property lacks adequate parking for its highest and best use as a catering hall. However, there is a tremendous difference in the experts’ calculations of the deduction to be taken for that defect. Defendant’s expert includes the defect within his 5% functional obsolescence calculation of $283,888 for 2006, and $306,328 for 2007. If I accept plaintiffs 4% functional obsolescence conclusion for the inadequacies of the improvements other than the parking-the conclusion of defendant’s expert is only 1% of construction costs for inadequate parking-$56,778 for 2006, and $63,266 for 2007. Plaintiffs expert concludes that obsolescence due to inadequate parking is $1,650,000 for 2006 and $1,749,000 for 2007, his estimates of the cost to cure the inadequate parking (calculated at the market price to purchase the adjoining vacant lot, currently used by plaintiff to park cars, plus a 10% premium over that cost because plaintiff would be forced to buy an adjacent lot).
This argument fails for two reasons. First, it is unsupported by appraisal theory. Second, as a practical matter, it makes no sense.
*262 A. Appraisal Theory

1. The Property’s Low Parking Ratio is Curable, Functional Obsolescence

“Functional obsolescence is caused by a flaw in the structure, materials, or design of the improvement when compared with the highest and best use and most cost-effective functional design requirements at the time of the appraisal.... Functional obsolescence, which may be curable or incurable, can be caused by a deficiency, which means that some aspect of the subject property is below standard in respect to market norms.” The Appraisal of Real Estate (12th ed.2001), supra, at 403. External obsolescence on the other hand is “a temporary or permanent impairment of the utility or salability of an improvement or property due to negative influences outside the property.” Id. at 363. External obsolescence is often incurable. Id. at 412. It is generally caused by outside economic factors, such as an oversupplied market, or locational factors, such as a property’s proximity to an environmental disaster. Ibid. Whether the obsolescence is curable is important because curable obsolescence “can be measured in terms of cost,” whereas incurable obsolescence “must be estimated in terms of a percentage.” RCA Corp. v. Township of East Windsor, 1 N.J.Tax 481, 502 (Tax 1980).
In this case, the property’s low parking ratio is a deficiency properly classified as curable, functional obsolescence. The factor driving the obsolescence is not external in nature, as the deficiency is not caused by external economic or market forces, or by the property’s location next to an environmental disaster. Rather, the subject “property suffers functional obsolescence because it lacks something that other properties in the market have,” i.e., an adequate parking ratio. Appraisal of Real Estate, supra, at 404. Additionally, the property’s deficiency is curable because it may be remedied through the leasing or purchase of additional parking space, as the catering hall’s owner-operator has done in this case by leasing the neighboring parking lot. Thus defendant’s appraisal expert correctly classified the property’s low parking ratio,as curable functional obsolescence, which should be measured in *263 terms of cost rather than percentage, where possible. Cf. RCA Corp., supra, 1 N.J.Tax at 502.

2. Accepted Methods for Valuing Functional Obsolescence

There are several generally accepted methods for valuing functional obsolescence. The Appraisal of Real Estate sets forth a five-step method that can be used in certain circumstances to calculate functional obsolescence, whether curable or incurable. See Appraisal of Real Estate, supra, at 406-12. Functional obsolescence is calculated under this method using the following equation:
Procedure for Estimating All Forms of Functional Obsolescence
Step 1. Cost of existing item.
Step 2. Less: < Depreciation previously charged >
Step 3. Plus: Cost to cure (all costs), or value of the loss Step 4. Less: < Cost if installed new >
Step 5. Equals: Depreciation for functional obsolescence.
However, this method may not correctly measure functional obsolescence in every instance. For example, “[t]his five-step formula indicates the correct result only when the replacement cost depreciation deduction related to the functional obsolescence is appropriately zero.” Joseph A. Laronge, “Solving the Functional Obsolescence Calculation Question?,” Appraisal Journal 327, 337 (July 2000).
Other accepted methods for valuing functional obsolescence include the two-step, four-step, and replacement and reproduction cost methods. Joseph Laronge addresses the weaknesses of the two- and four-step methods in his article:
[The] two-step methodl,] which simply deducts the cost to cure (or value of the loss, if less), has little applicability. Where the depreciated replacement costs are less than the depreciated reproduction costs, simply deducting the cost to cure fails to recognize the additional cost savings in the cost-effective comparison property. Also when the depreciated replacement costs are more than the depreciated reproduction costs, which occurs when the anticipated net present value increase in cash flow justifies the added capital costs, simply deducting the cost to cure fails to recognize that the buyer of the comparison property only benefits from the net *264 between the additional capital costs and the cost to cure (or value of the loss, if less). When the buyer increases anticipated probability at the comparison property for an added cost, that additional investment must be accounted for when calculating reproduction functional obsolescence.
The [four-step method], sometimes proposed[,] deducts for the cost to cure and the depreciated reproduction cost of the existing item when the deficiency requires substitution or modernization (defect). This four-step method always fails to reflect market realities since, while appropriately deducting a depreciated cost for the existing item, it recognizes only a zero value for the replacement item which has at least the same utility as the existing item and may produce even more cash flow. This method will always indicate a windfall to a buyer equal to the depreciated replacement cost of the curing replacement item. If the buyer paid the indicated price from that method and then spent the cost to cure, curing the property, the buyer would have obtained the subject property 'as cured’ while investing less than its market value.... The market does not allow systemic windfalls since the price of the subject property would be bid up until there is not a windfall and equilibrium is reached.
[Laronge, supra, at 337-38 (emphasis supplied).]
It would appear that plaintiffs expert used the two-step analysis in this case.
The replacement and reproduction cost methods appear to escape the inadequacies of the methods discussed above, and should provide a correct calculation for both functional obsolescence and the market value of the subject property in this ease. New Jersey courts recognize as a reliable calculator of a property’s market value both the replacement cost method, E.g. Transcon. Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 516-17, 545 A.2d 746 (1988); American Cyanamid Co. v. Township of Wayne, 17 N.J.Tax 542 (Tax 1998), aff'd,, 19 N.J.Tax 46 (App.Div.2000); Best Foods v. Borough of Englewood Cliff's, 19 N.J.Tax 266, 276 (Tax 2001); MCI Telecommunications Corp. v. Township of West Orange, 18 N.J.Tax 26, 36-37 (Tax 1998), aff'd, 19 N.J.Tax 114 (App.Div.2000); Sears, Roebuck Co. v. Township of Rockaway, 12 N.J.Tax 381, 383 (Tax 1992), and the reproduction cost method. E.g. B.F. Goodrich Co. v. Township of Oldmans, 17 N.J.Tax 114, 118-24 (Tax 1997), affd, 323 N.J.Super. 550, 733 A.2d 1204 (App.Div.1999); Riegel Products Corp. v. Milford Bor., 13 N.J.Tax 546, 554-58 (Tax 1994); Badische Corp. v. Town of Kearny, 11 N.J.Tax 385, 394 (Tax 1990); Brockway *265 Glass Co. v. Township of Freehold, 10 N.J.Tax 356, 369 (Tax 1989), aff'd, 12 N.J.Tax 263 (App.Div.1991).
B. Experts’ Calculations of Obsolescence
It does not appear that plaintiffs expert used any of the sophisticated techniques suggested in the literature but instead simply deducted the full cost of purchasing the parking lot which is currently leased by plaintiff. His method most resembles the two-step method which is described and criticized by Laronge in the above-reproduced quotations. This single calculation, though calculated correctly, makes no sense, and the quotations from the Laronge article relating to the two-step method indicate its inadequacy.
First, when obsolescence, as estimated by plaintiffs expert, is more than 33% of the estimated value of the property before obsolescence and more than 50% of the final estimate of value, serious questions are raised about the expert’s conclusion of highest and best use. If a property valued as a catering hall is worth $3,000,000 but separately as land plus bricks and mortar is worth $4,800,000 (plaintiffs expert’s value without subtracting functional obsolescence), perhaps its highest and best use is not as a catering hall but for some other use which does not require such a large investment to cure its functional obsolescence.
Second, plaintiff’s expert’s method of calculating the property’s economic obsolescence is to deduct the cost of purchasing the adjoining lot with a 10% premium. Of course, if that property (the parking lot) were purchased, the subject property would be free of economic obsolescence. And the owner would have to own the second property which would be worth its purchase price. Thus, before the transaction the owner of Westwood Lanes would have a property worth (in plaintiffs expert’s opinion) only $3,089,141. But, by spending $1,650,000 he would have two properties worth $6,389,141, calculated as follows:
*266 $3,089,141 catering hall without parking
+1,650,000 cured functional obsolescence
4,739,141 catering hall with parking
+1,650,000 purchased parking lot
$6,389,141
Thus, by purchasing the parking lot for $1,650,000, the owner of Westwood Lanes would instantly double his investment. This makes no sense.
Plaintiffs expert’s method of calculating economic obsolescence has no basis in fact, in the real world, or in the appraisal literature. Calculations designed to estimate value must have a basis in reality. Plaintiffs calculation of economic obsolescence is rejected. Because I have no basis in the record for selecting a deduction for economic obsolescence other than the opinions of the two experts and because I have rejected plaintiff’s expert’s opinion, I am left with no basis in the record other than to accept defendant’s expert’s opinion and not allow any other deduction for functional obsolescence.
VIII.

Summary and Conclusions

The following table summarizes my conclusions discussed above.
Tax Year 2006 Tax Year 2007
Land Values $2,160,000 $2,250,000
Improvements $5,161,003 $5,569,601
Plus: Entrepreneurial Profit (10%) 516,160 556,960
_$5,677,763_$6,126,561 Less: Physical Depreciation (27% and 29%) (1,532,996)_(1,776,702)
Less: Functional
*267 Obsolescence (5%) (283,888) (306,328)
Value of Improvements_3,860,879_4,043,531
Total Land and Improvements_$6,020,879[3]_$6,293,531[3]
These values are compared to the common level ratio for 2006 and 2007 as follows:
assessment = ratio
true value
Tax Year 2006
$1,947,700 = .3235
$6,020,879
The chapter 123 common level ratio for 2006 was .3417 with an upper limit of .3930 and a lower limit of .2904. Since the calculated ratio is within the common level range, the 2006 assessment will be affirmed.
Tax Year 2007
$1,947,700 = .3095
$6,293,531
The chapter 123 common level ratio for 2007 was .3077 with an upper limit of .3539 and a lower limit of .2615. Since the calculated ratio is within the common level range, the 2007 assessment will be affirmed.
Judgments will be entered affirming both the 2006 and 2007 assessments.

 “Appraisal theory appears to dictate consideration of entrepreneurial profit because it motivates developers to construct improvements.” Badische Carp. v. Town of Kearny, 11 N.J.Tax 38% 402 (Tax 1990) (citing Appraisal of Real Estate (9th ed.1987)).

 Entrepreneurial incentive was first formally distinguished from entrepreneurial profit and developer's ice (profit) in The Appraisal Institute, Appraisal of Real Estate, 327 n. 1 (10th ed. 1992). It defined entrepreneurial incentive as that amount which "reflects the projected return that is required to attract an entrepreneur to invest capital in a project, based on market expectations. [It] may be expressed as a rate or percentage of cost.” Ibid. “The concept of developer’s fee [or entrepreneur ial profit] is distinct from entrepreneurial incentive. It represents compensation for the time, energy, and experience a developer invests in a project as well as a reward for the risks the developer takes. The developer's fee is equivalent to the salary the developer might otherwise obtain.” Ibid. Further, “ft]o avoid confusion, it is advisable to define entrepreneurial profit and developer’s fee specifically in the appraisal report . . [because] [s]ometimes the terms are used interchangeably.” Ibid. Interesting to note, The Appraisal Institute, Appraisal of Real Estate, 268 (7th ed. 1978) first alluded to the concept of entrepreneurial incentive when it defined entrepreneurial or developer's profit collectively as the “profit potential [that] offers the incentive for much new construction” which “may be derived from a comparison of the value indicated by the cost approach with the value indications derived from the market data and income approaches.” Ibid, (emphasis supplied).

 The bottom line is that on each and every point, I have accepted the defendant's expert’s opinion, and my conclusions of value in effect adopt the defendant’s expert’s opinion of value.