ANDRESINI, J.T.C.
This is the court’s opinion after trial in the above-referenced matter challenging the assessments on plaintiffs property for the 2007-2010 tax years. For the reasons set forth in this opinion the assessment will be reduced.

I. Procedural History and Findings of Fact

Regent Care Center, Inc. (“plaintiff’) is the owner of a property located at 50 Polifly Road in the City of Hackensack (“defendant”). The property is designated by the City of Hackensack as Block 100.01, Lot 5 (“subject property”). For tax years 2007, 2008, 2009 and 2010, the subject property was assessed as follows:
Land_$ 9,180,000
Improvements $10,639,000
Total $19,819,000
*143 The Director’s ratio in each year under appeal was as follows:
q_100%
2008_100%
2009 _94.20%
2010 99.16%
Plaintiff filed timely, direct appeals with this court. Defendant did not file counterclaims. Two witnesses appeared at trial: an appraiser called by plaintiff to testify as an expert witness with respect to value of the commercial property; and an appraiser called by defendant in the same field. Both witnesses were stipulated to being qualified as experts, which this court has accepted. The parties came to a number of other stipulations at trial, which this court has also accepted. The stipulations include:
The subject property was improved in 1988 and is utilized as a nursing home, containing 180 total beds. The property is 1.78 acres, containing a 78,781 square foot, five-story concrete and steel structure. There are three elevators, one of which is a service elevator, and a full sprinkler system. The zone is B-l and the current use of the property is its highest and best use (as developed).
Furthermore, the parties stipulated that the cost method is the appropriate method of valuation for the subject property. The parties stipulated to the following values for land value and cost new (without entrepreneurial profit or depreciation):
2007 _
_Land_$ 4,070,000
_Cost New $16,933,288
_Total_$21,003,288
2008 _
Land $ 3,940,000
Cost New $17,614,700
*144 Total ' $21,554,700
2009
Land $ 3,720,000
Cost New $18,939,344
Total $22,659,344
2010
Land $ 3,540,000
Cost New $17,936,719
Total $21,476,719
The two issues at trial were the amounts properly attributable to entrepreneurial profit and depreciation. The depreciation issue includes disputes over the appropriate values attributable to physical depreciation, functional obsolescence, and economic obsolescence.
Plaintiffs expert assigned 5% entrepreneurial profit in valuing the subject property, choosing that percentage for the subject property because it was built to suit the needs of an owner-occupier rather than a developer. The expert claimed that 5% to 10% was the typical range for entrepreneurial profit values associated with the construction of most types of property. Plaintiffs expert testified that since the subject property was being built to suit the needs of a specialized owner-occupier, rather than a developer, it was possible to assign zero entrepreneurial profit to it. Plaintiffs expert testified that because the subject property was built to suit the owner-occupier, the owner would expect to recapture profits from the business operations on the subject rather than from the real estate. Based on these considerations, plaintiffs expert applied a 5% figure for entrepreneurial profit, given that it was a value on the low end of the aforementioned range.
Defendant’s expert assigned a 10% figure for entrepreneurial profit, relying in part on his experience. Defendant’s expert testified that anyone looking to build a building like the subject *145 would look to be compensated for their efforts in improving the property. The expert testified that entrepreneurial profit for the subject property could theoretically be as low as 5% or as high as 20%. The expert stated that 10% return was reasonable for the subject property, given the effort required to build a multi-story nursing home facility with structural steel and poured concrete.
Plaintiffs expert used the age-life method of depreciation to assign a value for physical deprecation, dividing the effective age of the property by the estimated useful life of the subject. Plaintiffs expert assigned a 15 year effective age to the subject property based on a physical inspection of the property, a review of the history of repairs and maintenance on the property and discussions with the owner of the subject property. The expert verified the maintenance and repair history of the subject property through income and expense statements. The useful life reflected the expert’s determination of the projected economic life of the property. The expert estimated that the property had a 50 year useful life, calculated using the Marshall and Swift life expectancy guidelines. The expert divided the 15 year effective age by the 50 year useful life, arriving at a 30% deduction for physical depreciation.
Plaintiffs expert also deducted functional and economic obsolescence from the value of the subject property. The expert first came up with a 20% total figure for both forms of obsolescence before allocating 5% to functional obsolescence and 15% to economic obsolescence. The expert saw functional obsolescence in the subject property because it lacked several features present in newer nursing homes. Notable features the subject property lacked included: direct oxygen pumping into patient rooms, a generator capable of powering all outlets in patient rooms during power outages, and separate entrances for therapy rooms. Additionally, changes to Medicare and Medicaid limited the compensation the plaintiff could receive from those programs. According to plaintiffs expert’s testimony, Medicare policy has shifted to favor out-patient therapy. The expert testified that the shift in policy made it beneficial for nursing facilities to have larger therapy rooms in order to generate more revenue. Furthermore, Medic *146 aid reimbursements had a capital facility allowance that reimbursed the facility based on its real estate. The expert stated that certain aspects of the subject property were considered outdated by Medicaid’s standards, notably corridor width. Those outdated features limited how much of a capital facility allowance the subject property could receive with those Medicaid reimbursements. For these reasons, plaintiffs expert allocated 5% to functional obsolescence.
Plaintiffs expert allocated a 15% deduction for economic obsolescence, based primarily on the increase in vacancy and decrease in revenues for the subject property. The expert characterized these changes as permanent due to new construction and competition in Bergen County. During testimony, the expert elaborated on a number of changes the facilities saw during the period at issue. The subject property’s vacancy rate had increased by 15% from 2006, rising to approximately 25% by the time of the report prepared by plaintiffs expert. Plaintiffs expert also testified that the revenues at the nursing facility decreased during the period at issue, indicating that a decrease in Medicare reimbursements played the largest role in the decline. Plaintiffs expert stated Medicare income had declined 27% due to increased competition in the area. Plaintiffs expert also testified about a drop in Medicaid reimbursements to the subject facility. The expert felt the subject property would remain at a disadvantage because its facilities were not geared to the preferences of newer Medicare and Medicaid regulations regarding reimbursements, which favored out-patient therapy over in-patient care.
Defendant’s expert did not consider the age-life method. Defendant’s expert, instead, relied on tables by Marshall and Swift for commercial properties to arrive at an 8% deduction for physical depreciation. The figure was based on defendant’s expert’s determination of a 10 year effective age and a 45 year useful life. Defendant’s expert stated that he had inspected the subject in the past and had looked at other nursing homes, including some facilities which were newer than the subject.
*147 Defendant’s expert testified that he did not include either functional or economic obsolescence in the calculation of depreciation. The expert testified that five of the seven items cited by plaintiffs expert as contributing to the functional obsolescence of the property were curable and had to be measured in terms of cost to cure the deficiency, rather than with a fixed percentage. Defendant’s expert testified that only the Medicare changes and Medicaid rate restrictions on capital facilities allowance could be considered incurable, if even a functional obsolescence issue at all. Defendant’s expert applied no deduction for economic obsolescence because the decreases in the revenue of the subject property were not permanent and could stabilize with certain shifts in the market.
The plaintiffs expert[1] testified that, given the stipulated numbers, the market value of the subject property was the following for the valuation dates at issue:
October 1, 2006 $12,950,000
October 1, 2007 $13,200,000
October 1, 2008 $13,650,000
October 1, 2009 $12,950,000

II. Conclusions of Law

A. Presumption of Correctness

The court’s analysis begins with the well-established principle that “[ojriginal assessments and judgments of county boards of taxation are entitled to a presumption of validity.” MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:
The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment *148 is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be “definite, positive and certain in quality and quantity to overcome the presumption.”
[Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985)).]
The presumption of correctness arises from the view “that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law.” Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308 (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N. J.Tax 439 (Tax 1981)); see also Township of Byram v. Western World, Inc., 111 N.J. 222, 544 A.2d 37 (1988). The presumption remains “in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity.” Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517, 545 A.2d 746 (1988) (citation omitted).
“The presumption of correctness ... stands, until sufficient competent evidence to the contrary is adduced.” Township of Little Egg Harbor v. Bonsangue, 316 N.J.Super. 271, 285-86, 720 A.2d 369 (App.Div.1998) (citations omitted); see also City of Atlantic City v. Ace Gaming, LLC, 23 N.J.Tax 70, 98 (Tax 2006). “In the absence of a R. 4:37-2(b) motion ... the presumption of validity remains in the ease through the close of all proofs.” MSGW Real Estate Fund, LLC, supra, 18 N.J.Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence “as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion.” Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, *149 535, 666 A.2d 146 (1995)). To overcome the presumption, the evidence “must be ‘sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.’ ” West Colonial Enters., LLC v. City of East Orange, 20 N.J.Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J.Tax 405, 408 (Tax 1999), aff'd, 18 N.J.Tax 658 (App.Div.2000), certif. denied, 165 N.J. 488, 758 A.2d 647 (2000)). Only after the presumption is overcome with sufficient evidence at the close of trial must the court “appraise the testimony, make a determination of true value and fix the assessment.” Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 38-39, 455 A.2d 1136 (App.Div.1982) (citations omitted). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making an independent determination of value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312, 604 A.2d 580 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J.Tax 698, 703-704 (App.Div.1996).
The court finds that plaintiff produced sufficient evidence to overcome the presumption of validity attached to the assessments. If taken as true, the opinion of plaintiffs expert and the facts upon which he relied create a debatable question regarding the correctness of the assessments sufficient to allow the court to make an independent determination of the value of plaintiffs property.
Of course, a finding that plaintiff has overcome the presumption of correctness does not equate to a finding that the assessment is erroneous. To the contrary, plaintiffs overcoming the presumption merely permits the court to address the question of what value should be accorded to the subject property. Once the presumption is overcome, the “court must then turn to a consideration of evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence.” Ford Motor Co., supra, 127 N.J. at 312, 604 A.2d 580 (quotations omitted). “[Ajlthough there may have been enough *150 evidence to overcome the presumption of correctness at the close of plaintiffs case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case ... to demonstrate that the judgment under review was incorrect.” Id. at 314-15, 604 A.2d 580 (citing Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308).

B. Entrepreneurial Proñt

Plaintiffs expert added 5% entrepreneurial profit in the estimate of the value of the property, arguing that because the subject was built for the needs of a specialized owner-occupier, a low value was appropriate. Defendant’s expert added 10% for entrepreneurial profit because 10% was a reasonable return for a building of the type constructed on the subject property. The court concludes that a 5% inclusion of entrepreneurial profit is appropriate.
Entrepreneurial profit reflects the difference between a property’s total cost and its value after completion. The Appraisal Institute, The Appraisal of Real Estate, 388 (13th ed. 2008). It reflects “the entrepreneur’s compensation for the risk and expertise associated with development.” Ibid. An estimate of entrepreneurial profit is considered a fundamental component of a property’s total cost. Id. at 389. “The range of profit will vary for different types of structures and with the nature or scale of a given project.” Ibid. It is also recognized that “for certain types of specialized owner-occupied improvements, such as public buildings, no entrepreneurial profit may ever be recorded because the owner neither anticipates nor wants a profit.” Id. at 390.
New Jersey courts include entrepreneurial profit in determining the market value of property when “the developer or owner-operator makes improvements to property with the anticipation of realizing a profit on its subsequent resale.” Westwood Lanes, Inc. v. Borough of Garwood, 24 N.J.Tax 239, 249 (Tax 2008) (citing Lawrence Assocs. v. Township of Lawrence, 5 N.J.Tax 481, 535 (Tax 1983)). “New Jersey courts do not consider the status of the builder dispositive (as developer or owner-operator) to the determination of whether to include entrepreneu *151 rial profit within market value.” Westwood Lanes, Inc., supra, 24 N.J.Tax at 249 (citing Beneficial Facilities Corp. v. Borough of Peapack & Gladstone, 11 N.J.Tax 359, 381 (Tax 1990)). Entrepreneurial profit may still be inferred where there is no market data supporting its inclusion within market value if the court nevertheless concludes that the property would not be improved absent the likely compensation of a developer’s or owner-operator’s efforts. Westwood Lanes, Inc., supra, 24 N.J.Tax at 249 (citing Twin Oaks Assoc. & Health Res. v. Town of Morristown, 9 N. J.Tax 386, 397 (Tax 1987)). “Entrepreneurial profit is justified, even for an owner-occupied and owner-constructed building, because the principle of uniformity requires such property to be treated in the same manner as investment or speculation property.” Beneficial Facilities Corp., supra, 11 N.J.Tax at 381. “[I]t is necessary to include a figure which reflects the time, effort and incidental expense of the owner in the development of the property.” McGinley Mills v. Town of Phillipsburg, 9 N.J.Tax 508, 517 (Tax 1988).
In a case addressing the valuation of a nursing home, Judge Lasser observed that such a facility “would not be built, with all of the permits and licenses required, unless the developer could be assured that his efforts would be compensated.” Twin Oaks Assoc. & Health Res., supra, 9 N.J.Tax at 397. The court selected a 10% figure to represent entrepreneurial profit in that case[2]. Ibid. I concur with Judge Lasser’s reasoning in Twin Oaks Assoc. & Health Res., and accept plaintiffs expert’s 5% figure for entrepreneurial profit.
Plaintiff’s expert discussed the fact that the building was constructed to suit the needs of an owner-occupier rather than a developer, when testifying to his 5% calculation. Similarly, Plaintiffs expert, while stating that 5% to 10% represented the typical addition for entrepreneurial profit, explained that the subject property is improved with a multi-story nursing home facility that *152 required planning and effort to construct. However, the fact that it is built for an owner-occupier adequately supports a figure on the lower end of the scale.
Entrepreneurial profit might only be realized years after a built-to-suit, owner-occupied property is built when it sells to a similar owner-occupier at a premium because the property is suitable and immediately available, unlike new construction or conversion of a different property. The Appraisal Institute, supra at 390 (13th ed. 2008). Thus, to reflect the time, effort and incidental expenses of the owner-occupier in the development of the nursing home at the subject property, I accept plaintiffs expert’s 5% figure for entrepreneurial profit to be appropriate and reasonable.

C. Depreciation

Plaintiffs expert determined total depreciation to be 50%, whereas defendant’s expert calculated 8% total depreciation. Plaintiffs expert further broke down his depreciation figure into three parts: 30% physical depreciation, 5% functional obsolescence and 15% economic obsolescence. The court accepts plaintiffs expert’s calculation of 30% for physical depreciation, will include $900,000 for functional obsolescence, and will not include any economic obsolescence.

i. Physical Depreciation

Plaintiffs expert utilized the economic age-life method to calculate physical depreciation. Plaintiffs expert calculated a 15 year effective age and a 50 year useful life. Plaintiffs expert relied on a Marshall and Swift life expectancy guideline table specifically for nursing homes to determine effective age and useful life, as well as a physical inspection of the property. Defendant’s expert utilized a 10 year effective age and a 45 year useful life. Defendant’s expert relied on a different Marshall and Swift life expectancy guideline table for national commercial properties and testified to inspecting the property in the past, but relied on an associate’s inspection for the report submitted. Defendant’s expert also reviewed permits along with income and expense information regarding capital improvements and repairs and maintenance in *153 making his determination. Defendant’s expert did not utilize the economic age-life method.
The economic age-life method estimates total depreciation [3] by “calculating the ratio of the effective age of the property to its economic life expectancy and applying this ratio to the property’s total cost.” The Appraisal Institute, supra at 420 (13th ed. 2008). The economic age-life method is the simplest way to estimate depreciation. Ibid. The age-life method is a reliable estimate of depreciation and obsolescence when using the cost approach of valuation. See MCI Telecommunications Corp. v. Township of West Orange, 18 N. J.Tax 26, 35 (Tax 1998) aff'd, 19 N.J.Tax 114 (App.Div.2000).
The court accepts the plaintiffs expert’s calculation of physical depreciation. In terms of the functional age and estimated useful life of the subject, plaintiffs expert determined those values not only having personally conducted a physical inspection, but also having considered the repairs and maintenance history of the subject, including the fact that no major renovation had taken place since its construction in 1988. While defendant’s expert had also conducted physical inspections of the subject, the explanation regarding how he arrived at a 10 year effective age and 45 year useful life was comparatively lacking. While the defendant’s expert explained that he put information about the subject’s components into a computer model to generate those values, he did not elaborate further on what factors the computer model took into account to arrive at those values. Without more data or support regarding the actual data inputs or the weight given to the particular drivers for that computer model, it is difficult to conclude that a 10 year effective age is appropriate or reasonable. Since no major renovations have taken place in the subject since its construction in 1988, and since the facility is in constant use, a *154 15 year effective age adequately reflects the toll being taken on the subject from the building’s actual usage.
I find that the economic age-life method combined with the Marshall and Swift table specifically designed for nursing homes is a more reliable method than the Marshall and Swift table for national commercial properties relied on by defendant’s expert. A typical commercial property is not in continuous use. Many commercial properties are only in use during business hours and are not necessarily in use every day. A nursing home, on the other hand, operates 24 hours-a-day, every day. Such a building in continuous use will see a higher rate of wear and tear by virtue of the additional use of its components over a given period of time. Consequently, using a table designed to account for depreciation in all commercial properties nationally will not adequately account for the rate of depreciation occurring in a nursing home in constant use. Indeed, reliance on a nationally standardized table or chart cannot effectively replace an appraiser’s calculation for depreciation on a particular property supported by market data, observation, explicable analysis and calculation. Ford Motor Co. v. Township of Edison, 10 N.J.Tax 153, 191 (Tax 1988) (citing WCI-Westinghouse, Inc. v. Township of Edison, 7 N.J.Tax 610, 629 (Tax 1985)). Towards that end, the court will use the economic age-life method as a more accurate reflection of the depreciation in the subject nursing home given its continuous use. As a result, the court accepts the opinion of plaintiffs expert on depreciation as a more accurate reflection of the subject’s condition and with it, the expert’s depreciation calculation under the economic age-life method. Therefore, the court will apply a 30% deduction for physical depreciation.

ii. Functional Obsolescence

Plaintiffs expert attributed 5% functional obsolescence to the subject property, while defendant’s expert attributed 0%. Plaintiffs expert’s report listed seven factors, including actual physical deficiencies, as well as other restrictions posed by governmental regulations, like Medicare or Medicaid. Some of the physical deficiencies included a lack of direct oxygen pumping into rooms, and the fact that the emergency generator did not connect *155 to all outlets in patient rooms. Other deficiencies cited by plaintiffs expert relate to the facility’s physical therapy rooms, which were smaller and less efficient than those of contemporary facilities. Plaintiffs expert suggested a range between $900,000 and $4 million to upgrade these deficiencies. The expert settled on $900,000, representing 5% functional obsolescence. Defendant’s expert criticized plaintiffs expert’s opinion as a net opinion and stated that five of the seven factors are considered curable.
“Functional obsolescence is caused by a flaw in the structure, materials, or design of the improvement when compared with the highest and best use and most cost-effective functional design requirements at the time of the appraisal.” The Appraisal Institute, supra, at 434 (13th ed. 2008). “Functional obsolescence, which may be curable or incurable, can be caused by a deficiency, which means that some aspect of the subject property is below standard in respect to market norms.” Ibid. “Whether the obsolescence is curable is important because curable obsolescence ‘can be measured in terms of cost,’ whereas incurable obsolescence ‘must be estimated in terms of a percentage.’ ” Westwood Lanes, Inc., supra, 24 N.J.Tax at 249 (citing RCA Corp. v. Township of East Windsor, 1 N.J.Tax 481, 502 (Tax 1980)). The test of curability for functional obsolescence caused by a deficiency is whether the cost to cure the item will result in a value increment equal to or greater than the expenditure, or allow existing items to maintain their value, then the item is considered curable. The Appraisal Institute, supra at 434 (13th ed. 2008). Otherwise, if the cost to cure the item will not result in a value increment greater than the loss in value caused by the item or building component, then the item is considered incurable. Id. at 435.
Here, the items at issue are considered curable, functional obsolescence caused by a deficiency requiring the replacement of an existing item (i.e. curing a defect). The subject property requires modernization, and is currently substandard compared to other properties on the market. The proper measure is the excess cost to cure. Although plaintiffs expert presented the functional obsolescence as a percentage, testimony elicited at trial revealed a cost to cure of $900,000.
*156 The court rejects defendant’s expert’s testimony that there is no functional obsolescence at the subject property. The court gives the most weight to the newer technologies of in-room oxygen piping and electrical generator back-ups as factors that the plaintiffs expert considered when calculating his 5% figure. Therefore, the court will apply a $900,000 deduction for functional obsolescence using the replacement cost method. See Westwood Lanes, Inc., supra, 24 N.J.Tax at 264-65 (internal citations omitted).

iii. Economic Obsolescence

Plaintiffs expert attributed 15% economic obsolescence to the subject property, while defendant’s expert attributed 0%. Plaintiffs expert based his calculation primarily on the decrease in occupancy rates and revenues of the facility in recent years as well as reductions in government reimbursements. Defendant’s expert argued that the aging population will maintain demand for nursing home facilities.
Economic, or external obsolescence, is the reduction in value, temporary or permanent, of the utility or salability of an improvement due to negative influences outside the property. The Appraisal Institute, supra at 392 (13th ed. 2008). Factors extraneous to the property itself include: “changes in population characteristics and economic trends, excessive taxes, and governmental restrictions.” Transcontinental Gas Pipe Line Corporation v. Townships of Bernards, 111 N.J. 507, 541, 545 A.2d 746 (1988). External obsolescence may be estimated by allocation of market-extracted depreciation, market data analysis, or capitalization of income loss. The Appraisal Institute, supra at 443 (13th ed. 2008). Where a taxpayer’s expert fails to establish a basis for the deduction of economic obsolescence, the court may decline to make a deduction for it. See e.g., American Cyanamid Co. v. Township of Wayne, 17 N.J.Tax 542, 568 (Tax 1998).
Plaintiffs expert provided no economic data or empirical evidence relating to the lack of government reimbursements or increase of beds in other facilities. While plaintiffs expert points to increased competition to support a finding of economic obsoles *157 cence, the expert failed to provide actual data showing a stagnant or decrease in the number of eligible individuals to back such a claim. Although there may be more licensed nursing home beds in the area, there may also be an aging population demanding such supply. Plaintiffs expert did not provide any data in this regard. Moreover, N.J.S.A. 26:2H-8 provides the requirements for a new certificate of need to be issued:
No certificate of need shall be issued unless the action proposed in the application for such certificate is necessary to provide required health eare in the area to be served, can be economically accomplished and maintained, will not have an adverse economic or financial impact on the delivery of health care services in the region or Statemde, and will contribute to the orderly development of adequate and effective health care services ...
[N.J.S.A 26:2H-8 (emphasis added).]
Plaintiffs expert made no showing that the Commissioner has issued certificates of need for greater bed capacities than what the region can support both physically and economically. Generally, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing. See e.g. GE Solid State, Inc. v. Director, Div. of Taxation, 132 N.J. 298, 306, 625 A.2d 468 (1993); Merin v. Maglaki, 126 N.J. 430, 436-37, 599 A.2d 1256 (1992); Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 212, 584 A.2d 784 (1991). There is nothing in the record to demonstrate that the Commissioner did not comply with his statutory duties in licensing beds. Therefore, the court gives no weight to the opinion that increased competition and more licensed beds amongst other facilities leads to economic obsolescence.
Plaintiffs expert testified that there was a change in governmental reimbursements encouraging out-patient therapy; however, no data was introduced to demonstrate how the operator of the subject property has been marketing its facilities to patients for this type of care. The record reflects a decrease in the income at the subject property for the tax years in question, which defendant’s expert does not dispute. Nevertheless, any decrease in income was not supported with data from the market or other nursing homes in the area. The income loss was only demonstrated by comparing previous years’ revenue stream to the revenue *158 streams of the tax years under appeal for the subject exclusively. Plaintiffs expert failed to offer support for the income loss other than testimony relating to increased competition. “The opinion of an expert depends upon the facts and reasoning which form the basis of the opinion.” Dworman v. Borough of Tinton Falls, 1 N.J.Tax 445, 458 (Tax 1980). When an expert fails to offer an adequate explanation for the basis of an opinion, them opinion is entitled to little weight. Ibid. In other words, “an expert’s opinion is only as good as the data upon which the expert relied.” Greenblatt v. City of Englewood, 26 N.J.Tax 41, 54-55 (Tax 2011). Without economic data from the market or other corroborating evidence by plaintiffs expert, his opinion is given little weight.
The court agrees with defendant’s expert that the subject property does not suffer from economic obsolescence.

III. Valuation Summary and Conclusions

The following table summarizes the court’s conclusions discussed above:
Valuation. Date: 10/1/07 10/1/08 10/1/09 10/1/10
Est. Cost New (stipulated) 16,933,288 17,614,700 18,939,344 17,936,719
Plus Entrepreneurial Overhead & Profit (5%) 846,664 880,735 946,967 896,836
Total Cost New 17,779,952 18,495,435 19,886,311 18,833,555
Less:
Depreciation/Functional (900,000) 900,000 900,000 900,000 900,000
Depreciation/Physical (30%) 5,333,986 5,548,631 5,965,893 5,650,066
Depreciated Value of Improvements 11.545.967 12,046,805 13,020,418 12,283,488
Plus:
Land Value (stipulated) 4,070,000 3,940,000 3,720,000 3,540,000
Total 15.615.967 15,986,805 16,740,418 15,823,488
Rounding the calculations in the above chart equates to market value of the subject property below:
October 1, 2006 $15,616,000
October 1, 2007 $15,987,000
October 1, 2008 $16,740,000
October 1, 2009 $15,823,000
*159 Pursuant to N.J.S.A. 54:51 A-6a, in a non-revaluation year an assessment must be reduced when the ratio of the assessed value of the property to its true value exceeds the upper limit of the common level range. The common level range is defined by N.J.S.A. 54:1-35a(b) as “that range which is plus or minus 15% of the average ratio” for the municipality in which the subject property is located. The formula for determining the subject property’s ratio is:
Assessment divided by True Value = Ratio.

A. Tax Year 2007

The ratio for the subject property in tax year 2007, therefore, is determined as follows:
19.819.000 divided by 15,616,000 = 1.27%
The chapter 123 ratio for defendant in tax year 2007 was 1.00 with an upper limit of 1.00 and a lower limit of .85. The ratio for the subject property exceeds the common level range. Pursuant to N.J.S.A. 54:51A-6c, if both the average ratio for the municipality and the ratio of the assessed value of the subject property to its true value exceed the county percentage level (1.00), the court shall enter judgment revising the assessment by applying the county percentage level (1.00) to the property’s true market value.
For tax year 2007, the Tax Court Clerk is directed to enter judgment, in accordance with this opinion, as follows:
Land 4,070,000
Improvements 11,546,000
Total 15,616,000

B. Tax Year 2008

The ratio for the subject property in tax year 2008, therefore, is determined as follows:
9.819.000 divided by $15,987,000 = 1.24%
The chapter 123 ratio for defendant in tax year 2008 was 1.00 with an upper limit of 1.00 and a lower limit of .85. The ratio for the subject property exceeds the common level range. Pursuant *160 to N.J.S.A. 54:51A-6c, if both the average ratio for the municipality and the ratio of the assessed value of the subject property to its true value exceed the county percentage level (1.00), the court shall enter judgment revising the assessment by applying the county percentage level (1.00) to the property’s true market value.
For tax year 2008, the Tax Court Clerk is directed to enter judgment, in accordance with this opinion, as follows:
Land 4,070,000
Improvements 11,917,000
Total 15,987,000

C. Tax Year 2009

The ratio for the subject property in tax year 2009, therefore, is determined as follows:
19.819.000 divided by $16,740,000 = 1.18%
The chapter 123 ratio for defendant in tax year 2009 was .942 with an upper limit of 1.00 and a lower limit of .80. The ratio for the subject property exceeds the common level range. Pursuant to N.J.S.A 54:51A-6b, if the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property.
For tax year 2009, the Tax Court Clerk is directed to enter judgment, in accordance with this opinion, as follows:
Land 4,070,000
Improvements_11,699,000
Total 15,769,000

D. Tax Year 2010

The ratio for the subject property in tax year 2010, therefore, is determined as follows:
19.819.000 divided by $15,823,000 = 1.25%
The chapter 123 ratio for defendant in tax year 2010 was .9916 with an upper limit of 1.00 and a lower limit of .84. The ratio for *161 the subject property exceeds the common level range. Pursuant to N.J.S.A. 54:51A-6b, if the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property.
For tax year 2010, the Tax Court Clerk is directed to enter judgment, in accordance with this opinion, as follows:
Land 4,070,000
Improvements 11,620,000
Total 15,690,000

 Defendant’s expert never testified as to final market value based on the stipulated numbers. Defendant's expert’s market value conclusions as of the valuation dates at issue in his report do not reflect the stipulations.

 The taxing district’s expert opined 15% for entrepreneurial profit, whereas the taxpayer’s expert did not include a value for same. See Twin Oaks Assoc. & Health Res., supra, 9 N.J.Tax at 397.

 A variation of the economic age-life method is acceptable where an appraiser can deduct certain items of depreciation from total cost before applying the age-life ratio. Such variations combine techniques from the market extraction and breakdown methods with the traditional economic age-life method. See The Appraisal Institute, The Appraisal of Real Estate, 422 (13th ed. 2008).