NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

TAX COURT OF NEW JERSEY



**Patrick DeAlmeida**
 **Presiding Judge**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625-0975
(609) 292-8108 Fax: (609) 984-0805

November 14, 2017

Michael A. Vespasiano, Esq.
331 Main Street
Chatham, New Jersey 07928

Joseph Sardillo, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962

> Re:     Excel-Care, Inc. v. Township of Cranford
>          Docket No. 005180-2009
>          Docket No. 007259-2010

Dear Counsel:

This letter constitutes the court's opinion after trial in the above-referenced matters challenging the assessment on plaintiff's real property for tax years 2009 and 2010. For the reasons stated more fully below, the assessment for both tax years is reduced.

I.  Procedural History and Findings of Fact

The following findings of fact and conclusions of law are based on the evidence and testimony admitted at trial.

Plaintiff Excel-Care, Inc. is the owner of real property located in defendant Township of Cranford.  The property, an approximately 10.5-acre parcel, is designated in the record of the township as Block 292, Lot 3.01 and is commonly known as 205 Birchwood Avenue.

The property is improved with a 98,520-square-foot building housing a 180-bed nursing home that provides sub-acute care, long-term care, physical therapy, wound management, and other medical services.  Constructed in the mid-1950s, the structure was expanded with the addition of new wings in 1975 and 1989.  One of the additions has a second story housing 15 assisted living units and an associated dining and recreation area.  The remaining areas are single story.  In addition to patient rooms, the structure has several dining rooms, lounges, and therapy rooms, as well as administrative offices and a kitchen.  All patient rooms have private bathrooms, but only rooms in the older areas of the facility have private showers.  The building is well maintained and of average quality.

On the relevant valuation dates, the subject was between 88% and 92% occupied with a mix of private pay, Medicaid and Medicare patients.  Patients at the subject property, as is generally the case at nursing facilities, pay for both care and lodging.  Undoubtedly, the larger share of patient fees are for nursing and personal care, but it cannot be disputed that a portion of the fees are for a tenancy in real property.  See Rolling Hills of Hunterdon, L.P. v. Township of Clinton, 15 N.J. Tax 364, 367-68 (Tax 1995)(holding that nursing home is income-producing property for purposes of N.J.S.A. 54:4-34).

For each of the tax years at issue the subject property was assessed as follows:

| | |
|---|---|
| Land | $3,348,000 |
| Improvement | $2,352,000 |
| Total | $5,700,000 |

The Chapter 123 average ratio for the township for tax year 2009 is 38.42%. When the ratio is applied to the assessment, the implied equalized value of the subject property for tax year 2009 is $14,836,022 ($5,700,000 ÷ .3842 = $14,836,022).

The Chapter 123 average ratio for the township for tax year 2010 is 39.05%. When the ratio is applied to the assessment, the implied equalized value of the subject property for tax year 2010 is $14,596,670 ($5,700,000 ÷ .3905 = $14,596,670).

On March 31, 2009, plaintiff filed a Complaint challenging the tax year 2009 assessment on the property.

On March 26, 2010, plaintiff filed a Complaint challenging the tax year 2010 assessment on the subject property.

The two appeals were consolidated for purposes of trial and this opinion.

During the trial, each party presented an expert real estate appraiser who offered an opinion of the true market value of the subject property on each of the relevant valuation dates. There is no dispute that the witnesses were qualified to offer their expert opinions, which are summarized as follows:

| Tax Year | 2009 | 2010 |
|---|---|---|
| Valuation Date | 10/1/2008 | 10/1/2009 |
| Plaintiff's Expert | $ 7,940,000 | $ 7,600,000 |
| Defendant's Expert | $17,600,000 | $16,500,000 |

The experts agree that the highest and best use of the subject property is its continued use as a nursing home facility. The court accepts this opinion of highest and best as credible.[1]

Plaintiff's expert offered an opinion of value based on the three commonly accepted approaches to estimate the market value of real property. Defendant's expert offered an opinion of value based only on the cost approach. He rejected the other two approaches as unreliable for a nursing home facility.

## II. Conclusions of Law

The court's analysis begins with the well-established principle that "[o]riginal assessments . . . are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:

> The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be "definite, positive and certain in quality and quantity to overcome the presumption."
>
> [Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985)(citations omitted)).]

The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote,

---

[1]     Defendant's expert opined that the highest and best use of the subject property as vacant is for any use permitted by the zoning in place at the subject and that the highest and best use of the subject as improved is as a nursing facility. He did not offer an express opinion of which of these two uses would be maximally productive. The expert, however, offered an opinion of value based on the cost of replacing the existing nursing facility, an implicit acknowledgement that he holds the opinion that the highest and best use of the subject is as a nursing facility.

supra, 100 N.J. at 413 (citing Powder Mill I Assocs. v. Township of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222 (1988). The presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity." Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517 (1988).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998)(citation omitted); Atlantic City v. Ace Gaming, LLC, 23 N.J. Tax 70, 98 (Tax 2006). "In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the close of all proofs." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters., LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003)(quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div.), certif. denied, 165 N.J. 488 (2000)), aff'd, 21 N.J. Tax 590 (App. Div. 2004).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making a value determination. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

At the close of plaintiff's proofs, the court denied the municipality's motion to dismiss the Complaints for failure to overcome the presumption of correctness attached to the assessments. The court placed its findings of fact and conclusions of law on the record in the presence of counsel. Those findings and conclusions will not be repeated here at length. Put succinctly, the court concluded that the opinions of value offered by plaintiff's expert, which is based on accepted methodologies for determining the value of real property, if accepted as true, raise doubt in the court's mind with respect to whether the assessment on the subject property exceeded true market for the tax year 2009 and 2010.

The court's inquiry, however, does not end here. Once the presumption is overcome, the "court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., supra, 127 N.J. at 312 (quotations omitted). "[A]lthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote, supra, 100 N.J. at 413).

6

A.      Approaches to Valuation.

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div.)(citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 2006)), certif. denied, 168 N.J. 291 (2001). "There is no single determinative approach to the valuation of real property." 125 Monitor Street, LLC v. City of Jersey City, 21 N.J. Tax 232, 237 (Tax 2004)(citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965); ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J. Tax 244 (Tax 1980)), aff'd, 23 N.J. Tax 9 (App. Div. 2005). "The choice of the predominate approach will depend upon the facts of each case and the reaction of the experts to those facts." Id. at 238 (citing City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537 (1963); Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51, 61 (Tax 1982)).

(1)      The Comparable Sales Approach

The comparable sales approach "usually provides the primary indication of market value in appraisals of properties that are not usually purchased for their income-producing characteristics." Appraisal Institute, The Appraisal of Real Estate, 419 (12th ed 2001). This method of valuation has been defined as "[a] set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments to the sales prices of the comparables based on the elements of comparison." Id. at 417.

(2)    The Income Capitalization Approach

The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J. 266, 270 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, The Appraisal of Real Estate 445 (13th ed 2008). This approach generally applies to real property that generates income from the rental of the property, not from the business activities that take place at the property.

Determining the value of real property pursuant to the income approach can be summarized in the simplest terms as follows:

$$\begin{array}{r} \text{Effective Gross Income} \\ \underline{- \quad \text{Operating Expenses}} \\ \text{Net Operating Income} \\ \\ \div \quad \text{Capitalization Rate} \\ \text{Value of Property} \end{array}$$

See Spiegel v. Town of Harrison, 19 N.J. Tax 291, 295 (App. Div. 2001), aff'g, 18 N.J. Tax 416 (Tax 1999); Appraisal Institute, The Appraisal of Real Estate 466 (13th ed 2008). In addition, where the sale of the subject property will include all assets of a business enterprise closely associated with the subject property it is necessary to extract from the value conclusion the value of personal property, often referred to as furniture, fixtures and equipment, and the value of the business enterprise to arrive at a value of only real property. Chesapeake Hotel, LP v. Township of Saddle Brook, 22 N.J. Tax 525, 526 (Tax 2005).

(3)     The Cost Approach

The cost approach is normally relied on to value special purpose property or unique structures for which there is no market. Borough of Little Ferry v. Vecchiotti, 7 N.J. Tax 389, 407 (Tax 1985); Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 452 (Tax 1980), aff'd, 180 N.J. Super. 366 (App. Div.), certif. denied, 88 N.J. 495 (1981). The cost approach "involves a replication, through the use of widely accepted cost services . . . of the cost of the components of the building to be valued, less . . . depreciation[s]." Gale & Kitson Fredon Golf, LLC v. Township of Fredon, 26 N.J. Tax 268, 283 (Tax 2011)(quotations omitted). "A cost approach has two elements – land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J. Tax 403, 417 (Tax 2004). From the estimated reproduction cost is deducted depreciation from all causes. Depreciation is defined as a loss in value from three causes: physical depreciation, functional obsolescence and external economic factors. The cost approach is most effective when the property being valued is new, in light of the difficulties in accurately estimating the various components of depreciation. See Worden-Hoidal Funeral Homes v. Borough of Red Bank, 21 N.J. Tax 336, 338 (Tax 2004).

B.     The Legal Precedents.

There are two published opinions that guide the court's analysis with respect to the valuation of nursing facilities. In Twin Oaks Assocs. v. Town of Morristown, 9 N.J. Tax 386 (Tax 1987), aff'd, 11 N.J. Tax 94 (App. Div.), certif. denied, 117 N.J. 155 (1989), the taxpayer challenged an assessment on a 304-bed proprietary nursing home. Income at the facility was derived from a mix of private patients and patients receiving Medicaid at per diem rates established by the State. Id. at 389. The taxpayer's expert used both the income capitalization approach and

the cost approach to reach an opinion of value. Id. at 390. He also considered the sale of a ground lease at the subject property, a transaction between related parties he considered to be arms' length. Id. at 392. The appraisal expert for the taxing district used only the cost approach to determine value. Id. at 393. "He was of the opinion that the property is special purpose property because the real estate and the business conducted in it are intertwined, and the business requires skilled management and is regulated by the State." Ibid.

Judge Lasser analyzed the question of which approach would provide the most credible evidence of value as follows:

> Proprietary nursing homes have unique characteristics which make it difficult to estimate their market value. Real estate alone is not the primary income producer as in an apartment house. Income is produced by a combination of the real estate, the personal property, which includes furniture, fixtures and equipment, and the services rendered by the staff, including food, 24-hour nursing services and activities for the patients. There is a limited market for proprietary nursing homes, and the real estate has limited alternative uses. The ability of the nursing home property to produce income is the source of the value of the real estate, but the income approach and the market approach suffer the disability of combining the value of the real estate with the value of the business conducted in the real estate. The income depends on the mix of private and Medicaid patients and the efficiency of management in maximizing income and minimizing expenses.

> [Id. at 394.]

The court adopted the municipality's argument "that if the property is valued for assessment purposes by the cost approach, this will reflect market value on an unregulated basis . . . ." Id. at 395. The court noted, however, that "the income and market approaches are useful where suitable information is available. In this case neither party presented evidence of sales of comparable nursing homes." Ibid. In addition, the expert opinion of value reached through the income capitalization approach was based on a fixed rate of income when the mix of private and

Medicaid patients was changing and "[n]o income approach valuation based on actual or projected net income was furnished." Ibid.

Judge Lasser concluded that "[b]ecause there is no evidence of either economic rent or comparable sales of nursing homes unencumbered by governmental rate restrictions, the cost approach is the only method by which to value the property uniformly with other properties in the taxing district. Therefore, I rely solely on the cost approach . . . ." Id. at 395-96.

The court in Regent Care v. City of Hackensack, 27 N.J. Tax 138 (Tax 2013), also used the cost approach to determine the value of a 180-bed nursing home. Use of that approach, however, was pursuant to a stipulation entered by the parties and adopted by the court. Id. at 143. While Judge Andresini provides insight with respect to application of entrepreneurial profit and depreciation when valuing a nursing facility, the parties' stipulation obviated the need for the court to engage in an extended analysis of which approach to value would be most credible in that case.

C.      More Credible Approach to Value.

Defendant's expert rejected the comparable sales approach to determining value. He testified that the market would not produce credible comparable sales because the sales price of a nursing home facility is influenced by economic factors such as occupancy levels, room rates, income, patient mix, and operating costs, which differ widely from facility to facility. According to the expert, sales prices do not reflect market value, given that the agreed upon price will likely have little to do with the characteristics of the real property, but will reflect value attributed largely to the business operations of the facility.

Plaintiff's expert considered the comparable sales approach, although he acknowledged that it is not the method usually considered for determining the value of a nursing facility. The expert's report indicates that the comparable sales approach "does not address the important issues

of quantity and quality of income streams" at nursing facilities. Nevertheless, he used the comparable sales method to corroborate the market values he determined under the other approaches to determine value.

The expert considered three sales in the period of 2006 to 2009 of property he identified as comparable to the subject. The expert reduced the sales price of each transaction to a price per patient bed. Prior to adjustments, the sales prices per patient bed were $40,816, $41,333 and $57,584. The expert made adjustments to these sales prices per unit for market conditions, and age, condition, and physical characteristics of the structures. The adjustments resulted in adjusted sales prices per patient bed of $46,812, $46,335, and $48,140.

The court is not persuaded that the bases for the expert's adjustments are reliable. The expert's market adjustments were based on the Senior Care Acquisition Report 14th Edition, by Levin and Associates. The expert interpreted this report broadly as indicating that "values of skilled nursing facilities increased between 2004-2007, and declined in 2008-2010." He did not explain how he determined from this report (the methodology of which was not explored in detail in his report or at trial) to make market adjustments of +6.2%, -5%, and -5% to the comparable sales prices.

In addition, the expert accounted for the income generated by the 15 assisted living units at the subject, an amenity not present at the comparable sale properties. Based solely on the records of actual income at the subject property, the expert determined that the assisted living units account for 3% of total "room and board" at the subject. He, therefore, applied a +3% adjustment to the sales price per unit of the comparable sales. It is not at all clear to the court that this is a credible and appropriate way to account for the assisted living units at the subject.

12

Based on the adjusted sales prices per patient bed at the three comparable sales, the expert opined a market price per patient bed of $47,000, which equates to a value of $8,460,000 for the subject property for both tax years. From this amount the expert deducted his estimate of value for furniture, fixtures, equipment, tradenames, licensing, and good will – items incorporated in the sales prices of the comparable sales but which are not subject to local property tax. The expert used a cost manual to derive a "cost per bed" of $5,000, which he depreciated to $3,000 per patient bed. This deduction did not account for the other elements of a going concern, such as good will and licensing.

The analysis of plaintiff's expert under the comparable sales approach illustrates why this approach is of questionable assistance in determining the true market value of real property used as a nursing facility. The expert did not rely on credible market data for his adjustments, did not credibly account for the assisted living units at the subject property, and did not reliably extract the value of the various elements of the business operation at the subject property. The court, therefore, rejects this approach to determining value.

Plaintiff's expert utilized the income capitalization approach to determine value, based on his finding that the operation of a nursing facility is similar to the operation of a hotel. He drew this comparison because with both types of property uses, the income realized by the business operation is attributable both to the real property and to other services. The court has previously recognized that with respect to hotel properties it is possible to account for the income generated by the business in order to estimate the income generated by the real property. See Glenpointe Assocs. v. Township of Teaneck, 10 N.J. Tax 380, 391 (Tax 1989)(applying Rushmore approach to determine value of hotel property), aff'd, 12 N.J. Tax 118 (App. Div. 1990); accord Prudential Ins. Co. v. Township of Parsippany-Troy Hills, 16 N.J. Tax 58, 60 (Tax 1995); see also Marina

District Dev. Co, LLC v. City of Atlantic City, 27 N.J. Tax 469 (Tax 2013)(applying Rushmore method to determine value of casino/hotel property), aff'd, 28 N.J. Tax 568 (App. Div.), certif. denied, 223 N.J. 354 (2015).

The court concludes that use of the income capitalization approach in this matter is unreliable for two primary reasons. First, the trial record does not contain a reliable basis for determining market income and expenses at the subject property. There is no evidence of lease transactions for nursing facilities. Thus, evidence of income attributable directly to the real property at such a facility is absent from the record. Plaintiff's expert used the actual income and expenses at the subject from Medicare, Medicaid and private sources, as market income and expense. The income represented charges that included both lodging and the various medical and other services provided to patients. He compared the subject's actual income and expenses to the actual income and expenses at a number of nursing facilities in the area of the subject to determine if they reflected market figures. The expert, however, did not identify the patient mix at the facilities to determine whether they were truly comparable to the subject property. In light of the regulated nature of payments for patients covered by Medicaid and Medicare, a comparison of the patient population at the facilities studied by plaintiff's expert is essential to determine comparability.[2]

Second, the expert's adjustment to account for the income attributable to the business operations at the subject was not reliable. The expert did not identify management contracts for nursing facilities in the marketplace. This is the type of data that is used in the context of hotels,

---

[2] Indeed, the expert acknowledged that Medicaid and Medicare rates can be "property specific and cannot be accurately reduced to a market rate." This observation calls into question whether the income capitalization approach would, for local property tax purposes, result in a credible opinion of the value of real property used as a nursing facility.

along with the market value of furniture, fixtures, and equipment, to estimate the value of the ongoing business at a property. Instead, the expert used the $3,000 per bed, depreciated cost of the furniture, fixtures, and equipment discussed above as the going concern value at the subject. This critical element of the expert's analysis under the income capitalization approach is lacking in credibility.

These shortcomings reflect some of the reasons why the income capitalization approach is problematic when endeavoring to determine the true market value of the real property components of a nursing facility. The court concludes that the evidence of value reached under the income capitalization approach in the trial record is insufficiently reliable and will be given no weight.

The cost approach, on the other hand, will provide a credible method of determining value in light of the special nature of the subject property and the dearth of reliable sales and income data. The court finds credible the opinion of defendant's expert that the subject property is a limited market, special purpose property. The structure was designed for a specific use and would likely require significant alterations to be put to any other use. The age and condition of the property can be adequately addressed through application of depreciation to the cost of replacement.

The experts reached similar conclusions with respect to several elements of the cost approach analysis. The greatest divergence is in their opinions of land value. Plaintiff's expert offered an opinion of land value of $2,535,000 for tax year 2009, and $2,340,000 for tax year 2010. Defendant's expert, on the other hand, offered an opinion of land value of $9,430,000 for tax year 2009 and $8,900,000 for tax year 2010. The court is constrained to reject the opinions of land value offered by defendant's expert. The land comparable sales upon which defendant's expert relied are of parcels with a highest and best use that differs from the subject property.

15

Both plaintiff's expert and defendant's expert opined that the highest and best use of the subject property as improved is its continued use as a nursing facility. Defendant's expert, however, opined that the highest and best use of the subject property as vacant is for any use compatible with the zoning in place at the subject. While defendant's expert did not expressly testify that his opinion of the improved highest and best would be more productive than his opinion of the vacant highest and best use, his analysis of value implies that he made such a determination. Defendant's expert reached an opinion of value by calculating the replacement cost of a nursing facility, a tacit acknowledgement that he reached the opinion that the continued use of the subject property as a nursing facility represented its highest and best use. If defendant's expert had concluded that the highest and best use of the subject was for a purpose other than a nursing facility, there would be no point in his having determined value under the cost approach based on the replacement of the existing nursing facility.

The five comparable land sales on which defendant's expert relied are of parcels with a highest and best use other than a nursing facility. The expert acknowledged as much, as he testified that the comparable land sales reflect his opinion of the highest and best use of the parcel as vacant as any use permitted by the zoning in place at the subject. The comparable land parcels he examined were for property approved for the construction of an apartment building, a bank branch, a hotel and restaurant, office buildings, and a school. These sales do not reflect the highest and best use adopted by the experts and the court. Those sales, therefore, are not comparable to the subject. See Ford Motor Co. v. Township of Edison, 10 N.J Tax 153, 178 (Tax 1988), aff'd, 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992); accord Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

The five comparable land sales upon which plaintiff's expert relied are more credible indicators of value of the subject property. Those sales are of parcels with approvals for nursing facilities.[3] The transactions took place between August 2000 and March 2009. The unadjusted sales price per unit for each tax year were:

$ 4,392
$12,913
$15,625
$17,083
$21,680

Plaintiff's expert made adjustments for market conditions, location, and project density. The adjusted sales price per unit for tax year 2009 were:

$ 5,600
$12,900
$15,200
$16,200
$20,600

On the basis of these adjusted sales prices per unit, the expert opined a market sales price per unit of $13,000 for tax year 2009.

The adjusted sales price per unit for tax year 2010 were:

$ 5,300
$12,300
$14,400
$15,300
$19,500

On the basis of these adjusted sales prices per unit, the expert opined a market sales price per unit of $12,000 for tax year 2010.

---

[3] Although questions posed by defendant's counsel during the cross-examination of plaintiff's expert suggested that one of the comparable land sales was approved for an assisted living facility, no evidence was proffered in support of this assertion.

Although the court finds the expert's adjusted sales prices per unit to be credible, the court will disregard the lowest of those figures. The $5,600 and $5,300 prices per unit strike the court as outliers not truly reflective of market value. The court instead, after weighing the remaining adjusted sales prices per unit concludes a market sales price per unit of $16,000 for tax year 2009 and $15,500 for tax year 2010. This translates to a market land value of $3,120,000 for tax year 2009 ($16,000 x 195 = $3,120,000) and $3,022,500 ($15,500 x 195 = $3,022,500) for tax year 2010.

The opinions of the two experts with respect to the replacement cost new of the improvements at the subject property differ slightly:

| Tax Year | 2009 | 2010 |
|---|---|---|
| Plaintiff's Expert | $15,165,800 | $15,165,800 |
| Defendant's Expert | $15,925,427 | $14,865,258 |

After adjustments for entrepreneurial profit, soft costs, and depreciation, the experts offered the following opinions of replacement costs:

| Tax Year | 2009 | 2010 |
|---|---|---|
| Plaintiff's Expert | $ 5,561,267 | $ 5,188,800 |
| Defendant's Expert | $ 8,169,744 | $ 7,621,260 |

The difference in these figures reflects the varying opinions of the experts with respect to the effective age of the subject property. Plaintiff's expert applied a depreciation factor of 66.67% for tax year 2009 and 68.89% for tax year 2010 based on his opinion that the improvements at the subject property had an effective age of 30 years and an economic life of 45 years for tax year 2009 and an effective age of 31 years and an economic life of 45 years for tax year 2010. He opined that the improvement suffered from no economic or functional obsolescence.

Defendant's expert, on the other hand, opined an effective age of 25 years for the improvements for both tax years. He based this opinion on the fact that although the improvements were approximately 30 years old, the owner had made adequate repairs and maintenance to slow the course of ordinary depreciation. In addition, defendant's expert opined that the building had an economic life of 40 years, not 45 years. Defendant's expert opined that the subject property suffered from no economic and minor functional obsolescence relating to the design of the building and technical advances in nursing facilities not present at the subject property. He applied a 10% factor to account for this element of depreciation.

The court adopts the depreciated replacement costs offered by defendant's expert for both tax years. The court finds credible the opinion that the subject property is well maintained and had effective age of 25 years on the valuation dates.

When the court's conclusions of land value are added to the depreciated replacement costs adopted by the court, the conclusion of true market value on the relevant valuation dates is as follows:

| Tax Year | 2009 | 2010 |
|---|---|---|
| Land Vale | $ 3,120,000 | $ 3,022,500 |
| Depreciated Replacement Cost | $ 8,169,744 | $ 7,621,260 |
| True Market Value | $11,289,744 | $10,643,760 |

The court finds that the true market value of the subject property on October 1, 2008 was $11,300,000 and that the true market value of the subject property on October 1, 2009 was $10,600,000.

D.    Applying Chapter 123

Pursuant to N.J.S.A. 54:51A-6a, commonly known as Chapter 123, in a non-revaluation year an assessment must be reduced when the ratio of the assessed value of the property to its true

value exceeds the upper limit of the common level range. The common level range is defined by N.J.S.A. 54:1-35a(b) as "that range which is plus or minus 15% of the average ratio" for the municipality in which the subject property is located.

The true values determined above must, therefore, be compared to the common level range for Cranford Township for the relevant tax years. The formula for determining the subject property's ratio is:

$$\text{Assessment} \div \text{True Value} = \text{Ratio}$$

1.  Tax Year 2009

$$\$5,700,000 \div \$11,300,000 = .5044$$

The chapter 123 average ratio for Cranford Township for tax year 2009 is .3842 with an upper limit of .4418 and a lower limit of .3266. The ratio for the subject property for this tax year is .5044, which exceeds the upper limit of the range for this tax year. Consequently, the court will determine the assessment for the subject property for tax year 2009 by multiplying the true value by the Chapter 123 ratio:

$$\$11,300,000 \ \text{x} \ .3842 = \$4,341,460$$

The court will round this figure to $4,300,000 and enter a Judgment establishing the assessment for the subject property for tax year 2009 follows:

| | |
|---|---|
| Land | $2,000,000 |
| Improvement | $2,300,000 |
| Total | $4,300,000 |

2.  Tax Year 2010

$$\$5,700,000 \div \$10,600,000 = .5377$$

The chapter 123 average ratio for Cranford Township for tax year 2010 is .3905 with an upper limit of .4491 and a lower limit of .3319. The ratio for the subject property for this tax year

20

is .5377, which exceeds the upper limit of the range for this tax year. Consequently, the court will determine the assessment for the subject property for tax year 2010 by multiplying the true value by the Chapter 123 ratio:

$$\$10,600,000 \quad x \quad .3905 \quad = \quad \$4,139,300$$

The court will round this figure to $4,140,000 and enter a Judgment establishing the assessment for the subject property for tax year 2010 follows:

| Land | $2,000,000 |
| Improvement | $2,140,000 |
| Total | $4,140,000 |

Very truly yours,

/s/ Hon. Patrick DeAlmeida, P.J.T.C.